RAGAN *v.* COX.

4-7899                                                   194 S. W. 2d 681

Opinion delivered May 27, 1946.

*J..B. Milham* and *Gladys Wied,* for appellant.

*Ernest Briner* and *Ben M. McCray,* for appellee.

GRIFFIN SMITH, Chief Justice. The case of *Ragan* v. *Cox* came to us on appeal from the Court's action in sustaining demurrers filed by the three defendants. We affirmed as to W. W. Beeson, clerk for Hot Spring County, but reversed with directions that W. A. Ragan and Ben H. Cox be required to answer the complaint. See *Ragan* v. *Cox et al.,* 208 Ark. 809, 187 S. W. 2d 874.

The plaintiff is Maggie Ragan, who sues for her daughter, Louise, alleging actual damages of $15,000, and $35,000 punitive because of the wrongful act of Ragan in attaching himself to Louise as her alleged husband through instrumentality of a ceremony performed by Cox, a Justice of the Peace, who defended on 'the ground that he acted under authority of license issued by Beeson, regular on its face, and giving the girl's age as eighteen years. The so-called "ceremony" was performed July 22, 1944. Louise was born February 3, 1932. She was, therefore, twelve years, five months, and nineteen days of age when Ragan induced her to acquiesce in the proposals he made.

When the case was here in May, 1945, the demurrer admitted allegations of the complaint, one of which was that Louise was Ragan's niece, "related to him within the fourth degree of consanguinity." We held that the law's interdiction against incestuous marriages rendered

the transaction void *ab initio*; hence the relationship of man and wife was not created. Pope's Digest, § 9018. Although the law has been brought forward from the Revised Statutes, ch. 94, § 3, it was amended by Act of March 5, 1875, p. 221, to include first cousins.

When the defendants Cox and Ragan answered on remand, Ragan alleged (and the assertion is not disputed) that the relationship as originally admitted was erroneous, and that he was Louise's great uncle, a degree of kinship not expressly prohibited by the statute relating to incestuous marriages. If it be conceded that this is true and that § 9018 of the Digest does not pointedly prohibit a great uncle from crossing his blood with one so distantly related, still Ragan cannot free himself from the unlawful status he so methodically created by allowing all that the prosecution alleges by way of aggravation to go unchallenged and falling back upon an unsubstantial and transparent plea of weakmindedness. The verdict was, ''We, the jury, find for the defendants, Ben H. Cox and W. A. Ragan.''

Thirty-two alleged errors are assigned in the motion for a new trial. As to Ragan, it is enough to say that the evidence is insufficient to show an absence of that mental sufficiency it was sought to impute to the fifty-two-year-old divorcee, thereby causing him without sufficient thought volition to seek as a wife a relative who had not reached the first of her 'teens.

Section 2927 of Pope's Digest provides that an infant under twelve years of age shall not be found guilty of any crime or misdemeanor. In an effort to bring the defendant within the scope of this language, Ragan's brother, Albert, testified that W. A., since ''breaking up'' with his family in 1937, ''has acted very peculiar. It seems like he was in more trouble than he had been; he acted unconcerned. He did not have much to say to anybody and does not know how to carry on a conversation—but sometimes he talks pretty clear. All his life he has been more or less peculiar. . . . It would be my guess that in 1943 and 1944 he had the mentality of a twelve-year-old boy.''

Even if § 2927 were applicable, (and it is not), the test there laid down is the mentality of an infant *under* twelve, as distinguished from one twelve or over. But the general rule is that an insane person is liable for his torts, unless the specific act complained of involves an intent which the person from whom recovery is sought is incapable of entertaining. Corpus Juris Secundum, v. 44, p. 281.

Cox testified that two or three days prior to the time Ragan and Louise "got married" Ragan came to him and discussed the matter briefly, saying only that "a couple wants to get married—that is, they want to, get married in two days." Ragan asked Cox if he would, at the time planned, come to the street curb and perform the ceremony, and Cox replied that he would. There is the further testimony by this defendant:

"When [Ragan] came to get me to go out [to a waiting automobile] and marry them he had the license. I looked at [the document] and saw that both names were Ragan, but it is not uncommon for me to marry people with the same names. I did not know what their relationship was, and still don't know—they could have been father and daughter. Ragan went with me to the car, where the girl was sitting on the back seat. I did not pay much attention to her; didn't try to find out anything about her. I did not ask anybody about her. I do not ask anybody when they want to get married. I go by the ages on the license. . . . I cannot [by looking at a girl between twelve and thirteen years of age] tell [whether] she is under sixteen years unless I pay enough attention. [If I have it on my mind to ascertain the age] I might tell something about her."

Instruction No. 1 was that if the jury believed Ragan "willfully, maliciously, or wantonly, and while of sound mind, with the mentality of a person above the age of twelve years, injured and damaged the plaintiff," she would be entitled to recover.

Instruction No. 2 told the jury the plaintiff should recover if it believed that Ben H. Cox solemnized the

marriage "willfully, wantonly, or maliciously, with the intent to injure and damage the plaintiff."

Appropriate objections were made to each instruction, and to others that are erroneous. It is sufficient to say that as to instruction No. 2, no mention is made of negligence on the officiating magistrate's part; nor, in respect of instruction No. 1, was it necessary as a pre-requisite to liability for the jury to find that Ragan acted willfully, wantonly, or maliciously. Nor as to damages other than punitive was it necessary (as to either defendant) to show willfullness, malice, or wantonness. We do not discuss other instructions because the judgments must be reversed and the causes remanded for a new trial.

In *Smyth* v. *State*, 13 Ark. 696, it was held that a minister or magistrate who performs an illegal marriage ceremony in the circumstances attending the case there at issue did so at his peril. It was said: "The law, which esteems marriage as the most solemn, the most binding, and [the most] important of all contracts, does not punish the parties to it, if within the age prescribed, . . . by avoiding the contract, but its policy is to discourage such marriages, and to punish those who engage in celebrating them without the consent of the parents or guardian of the minor. . . . The minister or magistrate performing the ceremony . . . cannot justify or excuse his agency in the violation of the law by showing that it was without any criminal intent on his part, or [that it was induced] by a deception practiced upon him." See *State* v. *Willis*, 9 Ark. 196; *Sikes* v. *State*, 30 Ark. 496.

Louise Ragan testified that as an inducement to the association he proposed, W. A. Ragan said he would buy her anything she desired:—"I did not know anything about being married; did not know what I would have to do or what acts I should do. I had never been taught anything about it; no instructions at all. [The defendant] did not talk very much about marriage before the ceremony was performed: he just told me he would get

me anything I wanted: he bought me candy, and a dress, and gum. . . . [Mr. Cox] performed a ceremony and told us we were husband and wife. . . . Mr. Ragan told me to keep it a secret—not to tell anyone.

"We left [my father's] home about ten o'clock that night; walked the railroad to the river bridge and remained there all night. The next morning we walked to Haskell. My folks were in bed and didn't know when we left. We changed our clothes at Haskell and got on the train and went to Jefferson, Texas, by way of Texarkana. We slept in one bed and he would not let me sleep in my dress—had me remove all of my clothing. We both had nothing on: no clothing. He had sexual intercourse with me that night. We went from Jefferson to Marshall and on to Longview, Texas. There we got a room at the Rainbow Tourist Court where we stayed nearly a week. We had no visitors there, but I talked with a few little girls. They wanted me to go play with them, but I told them 'No.' Ragan told me to tell them I was his daughter. He told the people I was his daughter until my father and the police came after me. Prior to this time he told the officers our names were Jones."

Maggie Ragan teestified that her daughter had not arrived at the age of puberty, and no information or instructions regarding the duties of a married woman had been given her.

When the former appeal was disposed of, the opinion called attention to construction of "void" as construed in *Kibler* v. *Kibler,* 180 Ark. 1152, 24 S. W. 2d 867, and in *Hood* v. *Hood,* 206 Ark. 1057, 178 S. W. 2d 670. Cases in other jurisdictions were also cited, where void was construed to mean voidable.¯ But in *Witherington* v. *Witherington,* 200 Ark. 802, 141 S. W. 2d 30, Mr. Justice HUMPHREYS, speaking for the Court (with one Judge dissenting from that part of the opinion which held that the marriage should not be annulled), employed this emphatic expression: "Of course, marriages between girls under fourteen and boys under seventeen could be annulled, but it is because such marriages are *absolutely void.*" The decision was handed down June 10; 1940.

The General Assembly convened in January, 1941. By Act No. 32 it amended § 9017 of Pope's Digest by permitting males who had arrived at the full age of eighteen years and females who had reached sixteen to contract marriage. There was then added: *"If under those ages, their marriages shall be absolutely void."* (Italics supplied.)

Act 404 of the same session, approved March 27, 1941, lends some clarity to Act 32, but is not in conflict with it and does not repeal it.

American Jurisprudence, v. 35, p. 212, § 46, discusses *"Unlawful or Irregular Marriages as Void or Voidable."* A definition, it says, which will closely fit modern conditions, is that a marriage may be considered voidable although prohibited by law when it is possible, under any circumstances, for the parties to contract or subsequently to ratify it; while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that the marriage is void. It is further said: "Wherever the impediment is such that it might not have been readily known to both parties before marriage, and where public policy does not rise superior to all considerations of private utility," the legislative tendency is to make marriages voidable, rather than void.

The same work (American Jurisprudence) cites cases in § 47 (p. 213) supporting the proposition that a void marriage cannot be validated by limitations or prescription, ". . . [or] at least this is true of a marriage void as against public policy and good morals."

Chancellor KENT is quoted in L. R. A. (1916C, pp. 692-93) to the effect that as to void marriages no sentence of avoidance is absolutely necessary, ". . . yet as well for the sake of the good order of society as for the peace of mind of all persons concerned, it is expedient that the nullity of the marriage should be ascertained and declared by the decree of a court of competent jurisdiction. And while annulment of a voidable marriage

renders it void *ab initio* unless it is otherwise provided by statute, as is often done, the usual provision being that the nullity shall exist from the time of the. decree to that effect, such a marriage is regarded as practically valid by all courts until its nullity has been declared in a proper proceeding maintained during the lives of the parties to the marriage. . . . And with respect to the effect of voidable marriages which are avoided in proper manner, it should perhaps be emphasized that by the practically unanimous opinion of judicial and text writers, the annulment of a voidable marriage renders it void *ab initio*, and of no civil effect, except as rights may be saved by virtue of statutory provisions.''

Section 9021 of Pope's Digest provides that when either. of the parties to a marriage shall be incapable, for want of age or understanding, of consenting to any marriage, or shall be incapable from physical causes of entering into the marriage state, or where the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction.

In the instant case the Chancery. Court rendered a decree September 18, 1944, in which it was found .that the ''alleged'' marriage was void.

In *Ragan* v. *Cox, supra,* effect was given the word ''absolutely'' in a statute declaring that incestuous marriages were absolutely void—and this was done because public policy had been proclaimed by the Legislature, making it imperative that the obvious meaning be ascribed. When the Act now appearing as 9021 of Pope's Digest was passed, the General Assembly was dealing with ''void'' in the sense ordinarily understood by the layman: that is, something that can be avoided. But when the Fifty-Third Assembly prefaced ''void'' with ''absolutely,'' it certainly had some purpose in view other than to use words, irrespective of meaning. If we are at liberty to say that a man who has passed the half century mark may fraudulently procure marriage license, and in consummation of lust induce a justice of

the peace to intone the phrases that in more favorable circumstances would result in marriage—if this can be done with a twelve-year-old girl, it can be carried still further and serve to unite an octogenarian with a female child appropriated from the play room; and if "absolutely void" means voidable and a married status continues until a court goes through the formality of annulling something that in common sense never existed, the mature wrongdoer need have no fear of carrying his "bride" across state lines for immoral purposes. The Mann Act [1] could not apply because at the time of transportation there had been no annulment. The sovereign State of Arkansas would stand between the itinerant and prosecution. Such could not have been the intention of the Legislature, and a Court does not have the right to ascribe to an Act an utterly barren result.

In the circumstances of this case the pretended marriage between W. A. and Louise Ragan was—certainly as to the appellee (through whose fraudulent agency the status was sought to be created)—a complete nullity. What effect the ceremony might have had upon any marriage status claimed by Louise does not enter into the discussion, because at her instance the records were purged.

Our holding, therefore, is: (a) That Ragan's fraudulent conduct, coupled with the provisions of Act 32 of 1941, resulted in a transaction which could not be dignified by the term "marriage," and that following a ceremony for which the procurer paid $2.50 to Cox, the relationship was exactly what it had been before—great uncle and grand niece; (b) that if Cox negligently contributed to a status whereunder Louise was subjected to injury and indignities, he is accountable to her, and the cause should be retried on its merits, under proper instructions, and in a manner not inconsistent with this opinion.

---

[1] Ragan is under indictment in Federal Court for violation of the Mann Act in taking the twelve-year-old child from Arkansas for immoral purposes.