FEIGENBAUM *v.* FEIGENBAUM.

4-7907                                    194 S. W. 2d 1012

Opinion delivered June 3, 1946.

Rehearing denied July 1, 1946.

*Carl L. Hunter,* for appellant.

*J. L. Taylor* and *E. G. Ward,* for appellee.

SMITH, J. The parties to this litigation are residents of the city of St. Louis in the state of Missouri, and were residents of that city at the time of their marriage in Corning, Arkansas, on July 14, 1944. They had been previously married and after having lived together, as man and wife, for fifteen years, were divorced in the state of their residence. The present suit was brought by the husband to annul this last marriage, and from a decree awarding that relief is this appeal.

The suit was predicated upon § 9021 of Pope's Digest which provides that: "When either of the parties to a marriage shall be incapable, from want of age or understanding, of consenting to any marriage, or shall be incapable from physical causes of entering into the marriage state, or where the consent of either party shall have been obtained by force or fraud, the marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction." Plaintiff alleged that his voluntary consent was not given, for the reason that

at the time of the marriage, he was under the influence of a drug, and the threats of violence made by the woman he married.

The question of jurisdiction first presents itself. The case of *Witherington* v. *Witherington,* 200 Ark. 802, 141 S. W. 2d 30, was a suit between non-residents of this state, to annul a marriage contracted in this state, but that relief was denied, without deciding the question of jurisdiction.

At § 1154, Schouler on Marriage, Divorce, Separation and Domestic Relations, p. 1413, it is said: "The question of jurisdiction for annulment is confused by the very real confusion in our decisions between divorce and annulment. There is a clear distinction between them, and their effects. Divorce expressly or impliedly sustains the validity of the marriage. One of the steps in obtaining a divorce is to prove a valid marriage. Annulment on the other hand proceeds on the theory that no marriage ever existed. Jurisdiction in divorce depends on domicile, but it seems that a suit for annulment of the *res* of the marriage should be brought where the *res* was created, that is, in the state where the marriage was celebrated, and there is some authority for this, which we submit is the correct view. The great weight of authority, however, seems to put jurisdiction for annulment on the basis of domicile largely as a result of statutory confusion between the two and partly on account of the failure of the courts to distinguish between them."

After citing cases from Massachusetts, New York and South Dakota sustaining what the author says is the better view that jurisdiction abides in the courts of the state where the marriage was contracted, there is cited in the footnote to the text the learned article by Professor Herbert F. Goodrich in 32 Harvard Law Review, 806. This article in the Harvard Law Review, in a very able and convincing manner, points out the distinction between suits for divorce and suits to annul a marriage. It was there said: "To recapitulate: since annulment of

a marriage differs so fundamentally from divorce, in that while the latter severs the matrimonial bonds, the former declares they never existed, jurisdiction to render the nullity decree is not to be found where the parties at the time it is sought may be domiciled. Only the law by which the marriage came into being has power to annul it. If the place of contract, domicile at the time of the marriage and domicile at the time of annulment, are the same, no difficulty is presented. If the place of contract is another state, its law can say that the parties involved did not validly contract, and there is then nothing on which a marital status can be predicated. Despite a valid ceremony by *lex loci contractus,* the then domiciliary law may say that no marriage status is created. But if the marriage can successfully run this gauntlet, it stands until dissolved by death or divorce.''

The question of jurisdiction is covered by the annotator's note in the case of *Bell* v. *Bell,* 128 A. L. R. 61. The many cases there cited show that the decisions on the subject are in hopeless conflict.

At § 140 of Professor Leflar's excellent work on ''Conflict of Laws,'' p. 286, it is said: ''Annulment of a marriage, strictly speaking, destroys the status as of its inception. Unlike divorce, the effect of it is to treat the parties as never having been married. Obviously annulment is for reasons existing at the date of the purported marriage, therefore the question of whether such reasons exist is to be determined by the law under which the marriage came into existence. As to the place having jurisdiction to render a decree of annulment, the restatement takes the view that the problem is the same as with jurisdiction to grant divorces, so that the only state which may validly grant a decree of annulment is one which is the domicile of one or both parties at the time of the decree. Undoubtedly such a state does have jurisdiction to annul the marriage. But there is also plentiful authority to the effect that the state under whose law the marriage purported to come into existence may annul it. This in one sense is the state of domicile, in that that state has ultimate control over the status of all its domi-

ciliaries, but more ordinarily it is the state in which the marriage ceremony was performed. There are numerous cases saying that there is jurisdiction to annul in the state in which the marriage was celebrated. Perhaps the law is not yet completely developed on the point, but it seems to be true that there is recognized jurisdiction to decree annulment at either place.''

We have reached the conclusion that the courts of this state have jurisdiction to determine the validity of a marriage performed in this state, in the suit of a non-resident, to annul it, and it is unnecessary to consider the jurisdiction of the courts of the domicile to determine that question, as our views would have no binding effect upon the courts of the domicile. Upon one branch of the case there is no difference of opinion, and that is, that wherever the question of the validity of a marriage may arise, the question must be determined in accordance with the laws of the state where the marriage was contracted.

We proceed to consider the case on its merits. The first marriage of the parties was dissolved by a decree of divorce, rendered in Missouri, the state of the residence, January 11, 1943, yet there appears to have been no cessation of the most friendly relations between the parties. The plaintiff is a lawyer, and the defendant was his client. He attended to her legal affairs, and advised her about her business and other matters. He admitted that he went out with defendant after their divorce, at least once a week for a year and a half, but he denied any cohabitation. They frequently dined and went together to shows.

Plaintiff testified that he sustained an injury to his jaw, which occasioned much pain, and that his doctor gave him a prescription for its relief. Defendant testified that plaintiff's injury was sustained after the second marriage.

Plaintiff's testimony was to the following effect. He did not give his consent to the marriage which took place July 14, 1944, inasmuch as he was under the influence

of a narcotic drug, codeine sulphate, and had been so for about twelve hours before the marriage, and he had been taking some of the drug for two nights prior to the marriage. He did not contend that defendant administered any of this medicine, or any other medicine to him. He testified:

"Commencing sometime the latter part of May of last year, the defendant continued to call me at night, sometimes as late as 3:00 or 4:00 o'clock in the morning, on the telephone; she would wake me out of bed, and I would be terribly frightened; at different days she would talk gloomily and despondently and neurotically about things that she thought were the matter with her, and things that were going to happen to her; she told me she was going to kill herself, unless I remarried her.

"On one occasion, many months before that, she had actually gotten me out of bed at 3:00 o'clock in the morning, and I had to drive clear out to her house, get my clothes and drive out there and she wouldn't go to sleep until I was there. For this reason, although I had followed the practice of being friendly with her since our divorce in January of 1943, and had been taking her out at least once a week, in the late spring of 1944, I discontinued going out with her for several weeks, because she would get excited, neurotic, hysterical, even refuse to get out of the car when I took her home."

On the evening of June 15, he was called to defendant's apartment to advise about a controversy she was having with the O. P. A. about one of her tenants. They went out together and returned to her home about midnight. She refused to leave the car, but was finally persuaded to do so. Soon after she called at his apartment about 2:00 a.m., and spent the night there. The next morning she refused to leave, went into the bath room and took a number of sleeping tablets, when she collapsed and was carried to the hospital. He took her from the hospital to her sister's home, and he called up every day or two to inquire about her. He was much worried and could not sleep.

About July 10 he took her for a ride, and he urged her to have a needed surgical operation, and offered to pay the expense of it. She refused to consent, and said she was going to commit suicide. He did not testify that defendant ever, at any time, threatened to do him any harm, if he did not marry her. On the night of July 12 he took a number of capsules which had been prescribed for his pain, and went to the home of defendant's sister, who told him that, "if you don't marry her she is going to do it again," that is try to commit suicide. He went to her house and she said to him, "we are going to get married, let's do it now." He learned that Arkansas was the only adjoining state that did not have a three-day waiting law.

He went to his office, saw his brother, and told him he was going to remarry his former wife, and when his brother protested, told him it was none of his business. Took another tablet, and left in a car with defendant, for Arkansas, about 5:00 p.m.; became ill and proposed that they return, but defendant said if he did, she would kill herself. They came to a town, the name of which neither of the parties remembered, walked around for about an hour and a half, when he finally found a drug store and took a double dose of bromo-seltzer. They registered as man and wife and spent the night together, without co-habitation, and the next morning resumed their journey to Corning, where they were married shortly before noon; remained in Corning about a half an hour and returned to Saint Louis, arriving there about 5:30 or 5:45 p.m.; saw a doctor after his return, who told him to go home and go to sleep, and to see him the next day.

At the time of his re-marriage, he was very dopey and drowsy, but had a feeling of exhilaration which made it seem everything would be all right regardless of what he did. Had only one bad feeling and that was one of nausea. Was very sick the night of his marriage and did not go to his office the next day, although he dressed and shaved. When they arrived in St. Louis defendant left his car and took a taxi to her home. He did not see her again for several days, when he took her out to dine.

During the meal she said she knew he was dopey when they married, and she agreed that the marriage might be annulled, but suggested that she have her operation before this was done. He continued to go with defendant as often as twice a week for two or three weeks after the marriage, but they never cohabitated, and she continued to be known by her maiden name, which she had resumed after her divorce, and she told him that she never expected to live with him. He told the justice of peace who performed the ceremony, that he had made a terrible mistake.

Defendant's brother, a registered pharmacist, testified that he saw plaintiff the day he left St. Louis for Corning, and that he was in a comatose or semi-dazed condition, and that if one had taken as much codeine as plaintiff said he had taken, ''it would leave a man in a semi-dazed condition, with control of his locomotive muscles, or in fact, he would know where he was going, but it would also leave him dazed as to any mental action.''

Plaintiff saw the doctor who had given him the prescription, and the doctor testified that the plaintiff was mentally excited when he saw him the next day. He was asked what the effect would be of taking an excessive quantity of the drug which he had prescribed, and he answered, it would produce bewilderment, mental confusion and physical instability.

After the testimony had been taken, plaintiff amended his complaint to allege the sexual impotency of defendant. This allegation may be disposed of by saying that the testimony does not sustain it.

The testimony on behalf of defendant is sharply conflicting on the essential points of the case. Defendant testified that plaintiff sought a reconciliation after the divorce, and his brother urged her to remarry plaintiff before he doped himself to death; that their relations were very cordial after the divorce. He was her attorney and advised her about her business and other affairs, and went with her two or three times every week to dinner, and to shows, and to night clubs, and he had

dinner with her family about twice every week, and frequently urged her to remarry him.

They visited each other at their respective apartments, and on one of her visits to his apartment, she found a younger woman in his bath room, who was wearing one of plaintiff's bath robes. He tried to explain the next day, but she said to him, "we are divorced. You are entitled to live your life."

On July 14, the plaintiff called on her at her sister's home, and again proposed a reconciliation. She asked about the girl she had seen in his room, and he said she was twenty-six, and he would soon be fifty, and there was too much difference in their ages, and he said, "I can't get rid of her. She won't let me." Plaintiff left, saying he was in trouble. Later he called her and proposed that they go to Arkansas to be married that day. Asked why the rush, he answered, "that Arkansas did not have the waiting law which the state of Missouri had." She agreed, and they left that afternoon for Corning.

Plaintiff appeared to be perfectly normal. They stopped on the way, in a small town, where they registered at a hotel as man and wife, but did not cohabitate. He was ill and she was fatigued, they resumed their trip and reached Corning about 11:00 a.m., the next day. They went to the office of the clerk of the county court and remained there about a half an hour. A citizen of the county who was in the clerk's office as a member of the equalization board, testified that he had quite a little conversation with the plaintiff, who appeared to be normal, and when he learned that plaintiff was a lawyer, he talked with him about looking after and selling some property he owned in St. Louis, and plaintiff suggested that he write to him, but he received a letter when he went home which caused him to make other arrangements, and he did not write to plaintiff.

The clerk, who issued the marriage license, testified that he heard the conversation between plaintiff

and Mr. Lewis, and that this, with his own conversation with plaintiff, indicated that plaintiff was ''physically and mentally at himself,'' and ''that there wasn't a thing wrong with him that was apparent to me,'' and that if it had appeared that plaintiff was under the influence of liquor or a drug, he would not have issued the license.

The justice of the peace who performed the ceremony about 10:30 testified that plaintiff and defendant were in his office about twenty-five or thirty minutes after the ceremony was performed; that they discussed the condition of the country and the crops; that he saw nothing wrong with plaintiff and ''in my estimation he was all right''; and he would not have performed the ceremony if he had had any doubt about plaintiff knowing what he was doing. He testified, however, that after plaintiff reached St. Louis he called him on the phone, and said that he wanted the marriage annulled, and asked witness to make no record of it, and when he told plaintiff he could not do this, plaintiff asked the name of some local lawyer, and the lawyer recommended was later employed.

Two doctors, testifying for plaintiff, stated that, if plaintiff had taken the quantity of the drug which he said he took, there would have been a muscular weakness and drowsiness which would have incapacitated him and rendered him unable to drive his automobile, yet he drove a car from St. Louis to Corning and back, making fair time, and without incident.

Defendant testified that they agreed they would keep their marriage a secret for a time, but that they resumed marital relations without residing together.

There is a total absence of evidence as to force or fraud, and the only evidence of a threat was that defendant threatened to commit suicide if plaintiff did not marry her, a statement which she denied making.

Plaintiff did not claim that he did not know all he was doing when he was married, and the testimony shows very clearly that he was fully aware of what he

was doing. We are left only to conjecture what influence the existence of the other woman in the case may have had on his actions.

In the case of *Phillips* v. *Phillips,* 182 Ark. 206, 31 S. W. 2d 134, we quoted as follows from the case of *Vanness* v. *Vanness,* 128 Ark. 543, 194 S. W. 498: "It is generally conceded in all jurisdictions that public policy, good morals and the interests of society require that the marriage relation should be surrounded with every safeguard and its severance allowed only in the manner and for the causes prescribed by law."

Marriage, affected as it is with the public interest, is a relationship too sacred to be trifled with as plaintiff is attempting to do, and the decree of annulment will, therefore, be reversed, and the cause dismissed.

ROBINS, J. (concurring). I concur in the finding of the majority that the evidence in this case is insufficient to authorize an annulment of the marriage of appellant and appellee; but I do not agree that the lower court had jurisdiction to award this relief.

Both of these parties at the time of the filing of this suit were and had been for many years residents of the state of Missouri. Neither of them had ever lived in Arkansas. Therefore, it seems to me, only the courts of Missouri had jurisdiction to determine whether these Missouri citizens had properly assumed the status of husband and wife.

The fact that the marriage ceremony was actually performed in Arkansas did not in itself confer jurisdiction on the Arkansas courts. If A and B, residents of Arkansas, while temporarily sojourning in Missouri, enter into a contract, and then return to Arkansas, certainly the courts of Arkansas would ordinarily have jurisdiction in an action between A and B to enforce the contract or to determine whether in fact it had ever been executed; and, though the laws of Missouri might control a construction of the contract, or in determining whether the contract was legally entered into, the courts of Mis-

souri would not be invested with any jurisdiction in the matter solely because it happened that the parties made the contract in that state.

Much of the deplorable conflict, confusion and uncertainty as to the law of domestic relations has arisen from the tendency of courts of some states to interfere'with the marital status of citizens of other states. In my opinion, the rule announced, apparently by a majority of the courts in the United States, to the effect that only the courts of the state of the domicile of at least one of the parties have the power to dissolve or annul the marriage, is the better one and the one more in accord with sound public policy.

The Supreme Court of Mississippi, in the case of *Antoine* v. *Antoine,* 132 Miss. 442, 96 So. 305, holding that the courts of Mississippi had no jurisdiction to annul a marriage between residents of Alabama solemnized in Mississippi well stated the rationale of the matter thus: ''The reason for this rule is that every government or state is entitled to establish, and change from time to time, the status of its domiciled subjects, but not that of the subjects of any other government or state. The courts of the domicile of married parties have the jurisdiction to determine, reverse, or modify the status, if married or single, of all persons domiciled therein, but not that of others. . . . Both of these parties being domiciled in Alabama, that court, and not this one, has jurisdiction in this cause.''

This statement is made in a discussion of jurisdiction of actions to annul marriage at p. 1349, vol. 38, of Corpus Juris: ''Jurisdiction of the marriage *res* depends upon the residence or domicile of plaintiff, and it is immaterial where the marriage was solemnized.''

In Restatement of the Law of Conflict of Laws (American Law Institute), pp. 167, 168, 173, it is said: ''Marriage is a status. While it is an intangible thing and without situation in space, it is nevertheless of peculiar interest to the state in which the spouses have their

domicil and where in the great majority of cases the family life is permanently carried on. The state of domicil is so peculiarly interested in the relation of marriage that it has jurisdiction over the status and may put an end to it for causes determined by its law. . . . A state cannot exercise through its courts jurisdiction to dissolve a marriage when neither spouse is domiciled within the state. . . . A state can exercise through its courts jurisdiction to nullify a marriage from its beginning under the same circumstances which would enable it to dissolve the marriage by divorce. A state can exercise through its courts jurisdiction to annul a marriage from the time of the decree under the same circumstances which would enable it to dissolve the marriage by divorce."

In my opinion the lower court had no jurisdiction and the decree ought to be reversed and the cause dismissed for that reason.