STATE *v.* GRAVES.

4886                                                      307 S. W. 2d 545

Opinion delivered December 9, 1957.

*Bruce Bennett,* Atty. General; *Clyde Calliotte,* Asst. Atty. General, for appellant.

*Sam L. Anderson,* for appellee.

SAM ROBINSON, Associate Justice. The appellees, Harold Graves and Mr. and Mrs. J. R. Spearman, were charged in the municipal court of Hot Springs with the offense of contributing to the delinquency of a minor. They were each fined $50.00 and costs, and appealed to the circuit court. There, the cases were tried before the court without a jury, and from judgments of not guilty as to all of the defendants the State has taken an appeal to this Court.

The facts are undisputed. Sandra Spearman, a girl 13 years of age, and Harold Graves, a boy 17 years of age, accompanied by Mr. and Mrs. J. R. Spearman, the parents of Sandra, and also by Mr. D. H. Graves, the father of Harold, went to Greenville, Mississippi, where, with the consent of Mr. and Mrs. Spearman and Mr. Graves, Harold and Sandra obtained a marriage license and were married. They returned to Arkansas, where Harold and Sandra lived together as man and wife for about four days, when Mrs. Murphy, attendance officer at the school in Hot Springs attended by Sandra, obtained a warrant in the municipal court of Hot Springs charging Harold and Mr. and Mrs. Spearman with contributory delinquency. There is no explanation of why D. H. Graves, who also made the trip to Mississippi and gave his consent to the marriage, was not charged in a like manner.

It appears that a few days before the trip to Mississippi for the wedding Mrs. Murphy had talked about the matter with Mrs. Spearman. Mrs. Murphy testified:

"A. Through the advice of Dr. Bruce and others I took Sandra to the place of business where the mother was—at the Park Place Baptist Church—and talked to the mother, presenting it to her—the ruling of a child

under 16 years of age marrying would not be legally married in the State of Arkansas. Mrs. Spearman was very nice, very considerate about the whole thing. She said that her prayers had been—that she had consented to the marriage and she prayed that the Lord would take care of it and she felt this was the answer to her prayers. And Mrs. Spearman and the girl both consented that was the thing, and the girl wanted to know if I would talk with the boy and I said I would be happy to. But the boy was between his school and going to work, at the time, and the girl spoke up and said, 'Mother, do you think it would be better if we talk with him tonight.' The mother agreed that she thought it would be better if they talked with the boy that night and see if it wouldn't be better to let everything be settled that way. I left Mrs. Spearman and took Sandra back to school. Mrs. Spearman was very nice, very appreciative of my coming to the church with her at the time. Then I went back to school and placed the child back in school, and that was my talk with Mrs. Spearman. That was my conversation with her.''

Mrs. Murphy further testified that Sandra is not a delinquent child. She was asked:

''Q. Do you know whether or not Sandra Spearman Graves is a delinquent child?

A. No, she has nothing against her whatsoever as a delinquent child. No, sir, I have never heard of anything against her.''

There is nothing in the record to indicate that the Graves or the Spearmans are other than good, upright people.

The charge of contributory delinquency against the defendants is not specific in any manner. It cannot be ascertained from any papers filed in court just whose delinquency the defendants are charged with contributing to, or the manner of such alleged offense. But it appears that the defendants were tried on the theory that the Mississippi marriage is void; that Harold and Sandra have lived together as husband and wife, and,

therefore, Sandra has become delinquent; and that the defendants have contributed to such delinquency—Harold by being a party to what is claimed to be a void marriage, and the Spearmans by consenting to such marriage. With this view of the situation in mind, the case turns on the point of whether the Mississippi marriage is void. The trial court based the judgment of not guilty on the theory that the Mississippi marriage is valid, not only in the State of Mississippi, but everywhere. We agree.

It is conceded that if Sandra and Harold were residents of Mississippi the marriage would be valid in that State and elsewhere, Sandra being 13 years of age and Harold 17 years of age, the parents of both parties agreeing to the marriage. And undoubtedly such marriage would be valid. *Hunt* v. *Hunt,* 172 Miss. 732, 161 So. 119. But appellants contend that the marriage is void in Arkansas because both parties to the marriage were domiciled in Arkansas. Ark. Stat. § 55-102 provides:

"Every male who shall have arrived at the full age of 18 years, and every female who shall have arrived at the full age of 16 years, shall be capable in law of contracting marriage; if under those ages, their marriages shall be absolutely void. * * *"

This brings us to the consideration of whether Arkansas will recognize the Mississippi marriage as valid in Arkansas. The general rule is, of course, that a marriage valid where it is celebrated is recognized as being valid everywhere. Restatement, Conflict of Laws, p. 185. But there are certain exceptions to the rule:

(1)  Polygamous marriage.

(2)  Incestuous marriage between persons so closely related that their marriage is contrary to a strong public policy of the domicile.

(3)  Marriage between persons of different races where such marriages are at the domicile regarded as odious.

(4) Marriage of a domiciliary which the statute at the domicile makes void even though celebrated in another state. Restatement, Conflict of Laws, p. 197.

Obviously the first three exceptions do not apply here, and it is equally clear that the fourth exception does not apply because we have no statute which forbids the creation, in another state, of the marriage status between persons such as the ones involved here.

In 35 Am. Jur. 289, it is said:

"Furthermore, a statute relating to the validity of marriages or capacity to marry will, according to one view, be held to apply to citizens or subjects outside the country or state in which it is enacted, even by courts of such country or state, *only where it includes such persons by express terms or necessary implication.* Indeed, the view has been taken that if a statute, *silent as to marriage outside the state,* prohibits classes of persons from marrying generally or from intermarrying, or declares void all marriages not celebrated according to prescribed forms, *it has no effect upon marriages, even of domiciled inhabitants, entered into or out of the state.*" (Italics ours)

In *In re Perez' Estate,* 98 Cal. App. 2d 121, 219 P. 2d 35 (1950), the California court said:

"Was the Arizona marriage of respondent and decedent void because it was contracted between the parties for the specific purpose and with the specific intent of evading the laws of California?

"This question must be answered in the negative. If parties who are residents of and domiciled in California, where their marriage would have been invalid, are married in another state in conformity with the laws of such state, even though they have entered such state with the avowed purpose of evading the laws of the state of California, such motive does not invalidate the marriage."

In our own case of *Feigenbaum* v. *Feigenbaum*, 210 Ark. 186, 194 S. W. 2d 1012, Mr. Justice FRANK SMITH said:

"* * * Upon one branch of the case there is no difference of opinion, and that is, that wherever the question of the validity of a marriage may arise, the question must be determined in accordance with the laws of the state where the marriage was contracted."

In the case of *State of Nebraska* v. *James Hand*, 87 Neb. 189, 126 N. W. 1002, the court, beginning with a quotation from *Van Voorhis* v. *Brintnall*, 86 N. Y. 18, said:

"'The validity of a marriage contract is to be determined by the law of the state where it was entered into. If valid there, it is to be recognized as such in the courts of this state, unless contrary to the prohibitions of natural law, or the express prohibitions of a statute. While every state can regulate the status of its own citizens, in the absence of express words a legislative intent to contravene the *jus gentium,* under which the question of the validity of a marriage contract is referred to the *lex loci contractus,* cannot be inferred. The intent must find clear and unmistakable expression.' The court cites *Medway* v. *Needham, supra* (16 Mass. 157, 8 Am. Dec. 131), and also quotes from *Putnam* v. *Putnam,* 8 Pick. 433 the following: 'If it shall be found inconvenient or repugnant to sound principle, it may be expected that the legislature will explicitly enact that marriages contracted within another state which if entered into here would be void shall have no force within this commonwealth.' Acting on that idea, Massachusetts subsequently enacted a law as follows: 'Where persons resident in this state, in order to evade the preceding provisions and with an intention of returning to reside in this state, go into another state or country, and there have their marriage solemnized, and afterward return and reside here, the marriage shall be deemed void in this state.' After the passage of that law, the supreme court of Massachusetts in *Com.* v. *Lane,* 113 Mass. 458, 18 Am. Rep. 509, in an opinion by Mr. Chief

Justice GRAY, on page 464 of 113 Mass. say: 'A marriage which is prohibited here by statute because contrary to the policy of our laws is yet valid if celebrated elsewhere according to the law of the place, even if the parties are citizens and residents of this commonwealth, and have gone abroad for the purpose of evading our laws, unless the legislature has clearly enacted that such marriages out of the state shall have no validity here. This has been repeatedly affirmed by well-considered decisions.' And this seems to be the overwhelming weight of the better reasoned cases on the subject. 1 Bishop, Marr. Div. § 880; *Courtright* v. *Courtright,* 11 Ohio Dec. Reprint, 413; *State* v. *Shattuck,* 69 Vt. 403, 40 L. R. A. 428, 60 Am. St. Rep. 936, 38 Atl. 81; *Norman* v. *Norman,* 121 Cal. 620, 42 L. R. A. 343, 66 Am. St. Rep. 74, 54 Pac. 143, quoting from *Com.* v. *Lane, supra; Sturgis* v. *Sturgis,* 51 Or. 10, 15 L. R. A. (N. S.) 1034, 131 Am. St. Rep. 724, 93 Pac. 696.

"To hold otherwise would be to render void numberless marriages and to make illegitimate thousands of children the country over. In 1 Bishop on Marriage & Divorce, 882, this thought seems to have been in the mind of the author. He says: 'It was formerly common for English parties wishing to intermarry without a compliance with their own marriage acts to go into Scotland, and there interchange the matrimonial consent simply in the presence of witnesses. Gretna Green was the most convenient point for the required hasty visit; and thus Gretna Green marriages became famous, and there was no question of their validity. But Parliament, in 1856, by Stat. 19 & 20 Vict. chap. 96, § 1, put an end to this by declaring that thereafter "no irregular marriage contracted in Scotland by declaration, acknowledgment, or ceremony shall be valid unless one of the parties had, at the date thereof, his or her usual place of residence there, or had lived in Scotland for twenty-one days next preceding such marriage." ' We do not question the power of a state to pass a law similar to that passed by Massachusetts, as hereinbefore set out, but our legislature has not seen fit to do so."

Likewise, the General Assembly of the State of Arkansas has not seen fit to declare void a marriage such as the one involved here, celebrated in a sister state where it is valid. And there is no strong public policy in this State requiring the courts to declare that marriages such as the one involved here are void *ab initio*. Appellant bases the contention that the marriage is void without a court decree to that effect solely on the word "absolutely" which appears in Act 32 of the Acts of the General Assembly for the year 1941 (Ark. Stat. § 55-102, heretofore quoted). That Act amends the Revised Statutes, c. 94, § 2, § 9017 of Pope's Digest, adopted in 1837. Chapter 94, § 2, § 9017 Pope's Digest, provides:

"Every male who shall have arrived at the full age of seventeen years, and every female who shall have arrived at the (full) age of fourteen years, shall be capable in law of contracting marriage; if under those ages, their marriages are void."

It will be noticed that under-age marriages are declared void; but Chapter 94, § 5 of the Revised Statutes (Ark. Stat. § 55-106) provides:

"When either of the parties to a marriage shall be incapable, from want of age or understanding, of contracting (consenting) to any marriage, or shall be incapable from physical causes of entering into the marriage state, or where the consent of either party shall have been obtained by force or fraud, the marriage shall be void, from the time its nullity shall be declared by a court of competent jurisdiction."

The 1941 Act does not mention Ark. Stats. § 55-106, which declares that such marriage shall be void from the time its nullity shall be declared by a court of competent jurisdiction. Prior to the adoption of the 1941 Act, which uses the term "absolutely void," our Court had declared that marriages between persons of prohibited ages were void only if declared void in a judicial proceeding. *Kibler* v. *Kibler*, 180 Ark. 1152, 24 S. W. 2d 867.

Moreover, in two cases decided subsequent to the adoption of the 1941 Act, the Court held that such mar-

riages were voidable and not void. *Hood* v. *Hood,* 206 Ark. 1057, 178 S. W. 2d 674; *Ragan* v. *Cox,* 208 Ark. 809, 187 S. W. 2d 874.

The only authority among our cases to the effect that the term ''absolutely void'' means that the marriage is void *ab initio* without a court proceeding in which it is nullified is the second *Ragan* v. *Cox* case, 210 Ark. 152, 194 S. W. 2d 681, but even that case appears to imply that certain marital rights may exist by reason of the marriage. If so, then of course some degree of validity must have attached to the marriage. The Court said:

''In the circumstances of this case the pretended marriage between W. A. and Louise Ragan was—certainly as to the appellee (through whose fraudulent agency the status was sought to be created)—a complete nullity. What effect the ceremony might have had upon any marriage status claimed by Louise does not enter into the discussion, because at her instance the records were purged.''

For a period of more than a century the established law, as well as the public policy of the State, was that underage marriages were valid until they were nullified by a court of competent jurisdiction. And now, the only authority for saying that the public policy of this State is otherwise is the decision in one case, which is contrary to the holding in two other cases (all decided since the adoption of the 1941 Act). In the circumstances, it can hardly be said that the public policy of this State against under-age marriages is so strong that such a marriage, valid in the state where it was contracted, is void in this State.

The celebration of a marriage gives rise to many ramifications, including questions of legitimacy, inheritance, property rights, dower and homestead, and causes of action growing out of the marital status. We have no statute which provides that marriages such as the one involved here, celebrated in another state, are void in the State of Arkansas.

Affirmed.

HARRIS, C. J., dissents; GEORGE ROSE SMITH and WARD, JJ., concur.

CARLETON HARRIS, Chief Justice, dissenting. In dissenting to the ruling of the majority, I am not as much concerned with this particular litigation as with the possible future consequences of such a holding. The Court's refusal to declare this marriage void, may well serve as encouragement to other youngsters, not of sufficient age to legally marry in this state, and their parents, who approve of such a proposed marriage, to evade the provisions of our own statute by simply traveling to another state for the marriage ceremony where the age requirement is more lenient than our own. Our own statute was undoubtedly passed because the legislature did not consider that boys and girls under the designated ages were normally or generally possessed of sufficient stability, logic, or experience, to reasonably understand the full significance or responsibilities of the marital status. The legislature fixed the minimum marriage age at 18 for boys, and 16 for girls, and declared that under those ages ''their marriages shall be absolutely void.'' In passing this statute, the General Assembly set forth the policy of this state, and I can conceive of no stronger words than *''absolutely void.''* Certainly the minimum ages are reasonable, and it possibly would not be seriously argued otherwise. The majority opinion cites several exceptions to the general rule that a marriage valid where it is celebrated shall be recognized as valid everywhere. I am sure that we all agree that such exceptions are sound in logic and principle, and I feel that this Court should go further and add a fifth exception, namely, ''marriage of a domiciliary which the statute at the domicile makes void.'' It is indicated that the majority would declare the within marriage void if our statute read as follows:

''Every male who shall have arrived at the full age of 18 years, and every female who shall have arrived at the full age of 16 years, shall be capable in law of contracting

marriage; if under those ages, their marriages shall be absolutely void *wherever consummated.*" [1]

This is stretching the point a little too far for me, and is, I think, contrary to the intent of the General Assembly. I cannot believe that that body intended to say that our citizens, under the age fixed, could not marry in this state, but could go elsewhere for the marriage ceremony, and thus legally avoid the statute in question. The majority concede that our own legislature has the right, authority, and power to declare such a marriage void; they simply say that such a declaration has not yet been made. I am of the opinion that such an intent was clearly implied by the Assembly in their use of the words *"absolutely void"* . . . for a marriage could not be absolutely void if it could be held legal *under any circumstances.*

I am willing to concede that such a holding might be contrary to the majority view elsewhere, but on a matter involving public policy, the welfare of our young people, and the sanctity of the home, I am left unpersuaded by views that other courts may have taken. It would not be the first time for this Court to adopt a minority rule; in fact, I quickly recall one case wherein we were the first state in the Union to adopt a particular policy.[2] This is not to say that there is a lack of authority for the position I take. In *Pennegar* v. *State,* 87 Tenn. 244, 10 S. W. 305, a similar question was before the court. The Tennessee law provided "When a marriage is absolutely annulled,[3] the parties shall, severally, be at liberty to marry again; but a defendant who has been guilty of adultery shall not marry the person with whom the crime was committed, during the life of the former husband or wife. * * *" One E. U. Hovey was divorced from her husband, John Hovey, upon petition of the husband charging her with adultery with William Pennegar. The decree adjudged charge fully proven, and the divorce was granted the husband solely upon such charge. The divorced wife and the partner in her guilt, shortly after the divorce, went to the state of Alabama, where they were married to each other,

---

[1] Added.

[2] *Leach* v. *Leach,* 227 Ark. 599, 300 S. W. 2d 150.

[3] Meaning divorce.

and on the next day after their marriage returned to the state of Tennessee, the place of their former and present residence, where they lived and cohabited as man and wife. They were indicted for lewdness, tried and convicted, and appealed to the Tennessee Supreme Court, which said:

"* * * The legislature has, beyond all possible question, the power to enact what marriages shall be void in its own state, notwithstanding their validity in the state where celebrated, whether contracted between parties who were in good faith domiciled in the state where the ceremony was performed, or between parties who left the state of domicile for the purpose of avoiding its statutes, when they come or return to the state; and some of the states have in terms legislated on the subject. *Where, however, the legislature, as in our own state, has not deemed it proper or necessary to provide in terms what shall be the fate of a marriage valid where performed, but has in the particular case contented itself with merely prohibiting such marriage, the duty is devolved upon the courts of determining, from such legislation as is before it,*[4] whether the marriage in the other state is valid or void when the parties come into this state. * * *

"Now, believing, as we do, that the statute in question, which we are called upon to construe in the case at bar, is expressive of a decided state policy * * * we will not allow such parties to shield themselves behind a general rule of the law of marriage, the wisdom and perpetuity of which depends as much upon the judicious exceptions thereto, as upon the inherent right of the rule itself. * * *"

In the case of *In re Stull's Estate,* 183 Pa. 625, 39 Atlantic 16, the Supreme Court of Pennsylvania rendered a like ruling. The statute provided:

"The wife or husband who shall have been guilty of the crime of adultery, shall not marry the person with whom the said crime was committed during the life of the former wife or husband; * * *."

---

[4] Emphasis supplied.

The wife of one Richard H. Stull obtained a decree of absolute divorce from him on the ground that he had committed adultery with one Ada Widdup. A few months thereafter, Stull and the said Ada Widdup, both citizens and inhabitants of Pennsylvania, went to the state of Maryland and married. They at once returned to Pennsylvania, and lived and cohabited as man and wife. The court, in holding such marriage void, said (in speaking of the statute):

"* * * It forbids the marriage relation to be contracted in the most general terms. The guilty party 'shall not marry the person with whom the said crime was committed.' A personal incapacity to marry is imposed. The necessary meaning of this language is that they shall not marry at all, in any circumstances, or at any time, or any place, so long as the injured party is living. So far as the purpose and meaning of this statute are concerned, it is of no consequence where such subsequent prohibited marriage takes place. The relation itself is absolutely prohibited, and hence is within the operative words of the statute, without any reference as to where the marriage occurs. * * *

As stated by our learned Dr. Robert A. Leflar, in his book *Conflict of Laws*, Section 132, page 273:

"* * * Since the domicile by its law has ultimate control over the statutes of its domiciliaries, it in the last analysis decides whether any effort, made locally or elsewhere, to create a status, is successful * * *."

As was said by the New York Court of Appeals in *Cunningham* v. *Cunningham*, 206 N. Y. 341, 99 N. E. 845:

"* * * It will be recalled that the parties to this action reside in this state and have so resided ever since and before the marriage. The right of a government, as well as that of the several states of the Union to determine the marital status of its own citizens and prescribe the terms and conditions upon which their relations may be changed is elementary and beyond question. * * *"

Further citations could be given, but I feel the foregoing sufficient to establish by point, *viz.*, this Court has

full legal authority, and could, if it so desired, declare this marriage void.

Young people below the Arkansas statutory age for marriage may well be puzzled as to how a thirteen-year-old child is enabled to take a husband, contrary to the provisions of our statute, and openly live with that husband without fear of prosecution. It was admitted in this cause that Harold and Sandra went to Mississippi for the sole purpose of getting married, intending at all times to return to their home in Arkansas. This Court has now placed itself in the position of approving evasion and avoidance of our own statutes.

As previously pointed out, the clear inference in the early part of the majority opinion is that this marriage would be declared void if our legislature had gone further and declared such marriages void, though celebrated in a state where same were valid. Despite this inference, there is further language in the opinion which indicates that even if this marriage had been solemnized in Arkansas, it would still be considered valid until nullified by a court of competent jurisdiction. If such is the case, I desire to dissent with even more vigor, for I am unable to comprehend what language the legislature could have used to make its wishes more emphatically known (than the language in the statute heretofore referred to, Section 55-102). After declaring marriages entered into by males under the age of 18 years, and females under the age of 16 years, to be absolutely void, the statute further provides:

"* * * Provided that males under the age of 21 years and females under the age of 18 years shall furnish the clerk before the marriage license can be issued, satisfactory evidence of the consent of the parent or parents or guardian to such marriage, and, in all cases where the consent of the parent or parents or guardian is not provided or there shall have been a misrepresentation of age by a contracting party, such marriage contract may be set aside and annulled upon the application of the parent or parents or guardian to the Chancery Court having jurisdiction of the cause. * * *"

This provision makes it very clear to me that the legislature is declaring that marriages of males between the ages of *18 and 21,* and females between the ages of *16 and 18* may, under the prescribed circumstances, be set aside and annulled by court action; *i.e., those marriages are voidable, but it is quite noticeable that no such provision is made relative to marriages under 18 (for males) and under 16 (for females).* The reason is obvious—the General Assembly meant the latter marriages to be *void ab initio.*

The question of whether the parents of Sandra, and Harold Graves, are guilty of contributory delinquency is academic in any event, since they have already been acquitted by the Circuit Court. There is no question, in my mind, however, that if this Court held the within marriage to be void, all parents, or others, in the future who encouraged, aided, or abetted one under the statutory age to enter into marriage, would be guilty of contributing to the delinquency of a minor. I probably would go further and state—if the matter were other than academic—that any parent who would assist and encourage a thirteen-year-old child to enter the marriage relationship, contrary to the law of the domicile, though the marriage is valid where performed,—is contributing to the delinquency of a minor. Parents, in my opinion, should teach their children to respect and obey the law—not evade it. At any rate, as the matter stands, they (parents) may, if they so desire, continue to ignore our statute, take their children to Mississippi, consent to the marriage ceremony, return to Arkansas, and no offense has been committed.

In my humble opinion, the marriage should be declared void.

GEORGE ROSE SMITH, J., concurring. It is with much reluctance that I join in the majority's conclusion that this marriage must be upheld. It was valid by the law of the place where it was performed, and, in the absence of a statute expressly prohibiting our underage domiciliaries from going elsewhere to be married, I think we are compelled to hold that this marriage is valid everywhere. Rest., Conflict of Laws, § 132. Even without a statute the

common law recognizes a strong local policy against polygamous, incestuous, and miscegenetic marriages and does not permit one to evade that policy of his own domicile by going to another state to be married. But, in the absence of statute, that principle has never been extended to underage marriages, and, in view of the strong policy in favor of the validity of all marriages, I am unable to join with Chief Justice HARRIS in reading into our statute, which of course is intended to govern ceremonies performed in Arkansas, an implied prohibition that would apply to this case.

It was at first my inclination to take a middle course, by saying that although the validity of this marriage would be recognized in this state our policy against underage marriages should prevent the couple from living together until attaining the age at which they might have been married in Arkansas with parental consent. That principle is of course applied in the three instances involving a strong common law policy against a particular marriage. Thus if the law of a foreign country permits a man to have two wives we would recognize the marriages for some purposes, as for the allowance of dower and other property rights, but we would not permit the husband to cohabit with two wives in this state. Rest., Conflict of Laws, § 134. It would in some ways be desirable to apply that principle to this case, but on further study I am bound to concede that such a view cannot be logically supported. If our statute, declaring underage marriages in this state to be absolutely void, is not explicit enough to establish a policy against marriages entered into by our minors elsewhere, we cannot say with consistency that the statute is nevertheless sufficiently strong to declare a policy against those minors living together when they come back home.

On one point, however, I cannot join in the majority opinion. In the second opinion in *Ragan* v. *Cox,* we pointed out that the earlier cases had construed the statutory word "void," with reference to underage marriages, to mean voidable only, and that the legislature evidently meant to change that rule by declaring in 1941 that such marriages should be "absolutely void." Ark. Stats. 1947, § 55-102. We therefore concluded in the *Ragan* case that "abso-

lutely void'' did not mean voidable and that the marriage considered there was ''a complete nullity.'' That decision was delivered by a unanimous court and in my opinion is wholly sound.

In the case at bar the majority, without actually overruling the second *Ragan* case, unsettle the law by criticizing that decision and by implying that it may not be followed in the future. I think the *Ragan* decision was correct, and I do not find much to support the majority's apparent change of position in the matter.

It is said that in two cases decided after the adoption of the 1941 act the court held underage marriages to be voidable and not void. This is true, but in neither case did the court discuss the fact that the statute had been changed by substituting ''absolutely void'' for the earlier ''void.'' Indeed, in one of these two cases—the first appeal in *Ragan* v. *Cox*—the record then indicated that the marriage was also incestuous. On this point we observed that the statute declared incestuous marriages to be ''absolutely void,'' and went on to say: ''Such marriages are not merely voidable, but void *ab initio.*'' If the phrase ''absolutely void'' makes an incestuous marriage void *ab initio,* it is hard for me to see why the phrase has a different effect when it is applied to an underage marriage.

The difference between the old statute and the new one was apparently not considered either in *Hood* v. *Hood* or in the first *Ragan* appeal. But that difference was carefully considered in the second *Ragan* opinion and was the sole basis for the court's holding that an underage marriage was, despite the earlier cases to the contrary, a complete nullity. I fully agree with that view, and I must protest against the present opinion, which creates uncertainty in the law where none seemed to exist.

PAUL WARD, J., concurring.  For any one to encourage a girl 13 years old [and so far as the majority opinion holds, it could be a girl of 8 years] to get married [even in Mississippi] is so revolting to my mind that I am constrained to write this brief concurrence.

It seems to me that the majority opinion has not dealt with the vital issue involved in this appeal. It has gone to

great length to show that the marriage of Sandra in Mississippi is a valid marriage in Arkansas. Regardless of whether that conclusion is sound or not, to me the real question is: Do our courts have any authority to punish a person for encouraging a girl of tender years to get married? It must be remembered that the people of this state, acting through its legislature, have said, Ark. Stats., § 55-102, that such a marriage is *absolutely* void. The people must have felt pretty strongly about this matter because the word "absolutely" was separately inserted into an old statute which made such a marriage merely "void."

Ark. Stats., § 45-204, defines a delinquent child as one who indulges in certain conduct deemed unwholesome —such as violating the law, visiting gambling places and pool halls, and wandering in the streets at night. True the above statute does not specifically mention marrying at the age of 13 or 8 years, but I submit that such is within the spirit of the law and that it is more revolting to our social concepts than the things mentioned in the statute. As I understand the reasoning in the majority opinion, it makes no difference whether the child which gets married is 13 years old or 8 years old.

Ark. Stats., § 45-239, makes it a misdemeanor for any one to contribute to the delinquency of a child—that is to encourage a child to engage in a forbidden course of conduct as defined above.

Since there might have been presented to the trial court in this case circumstances which justified it in dismissing the charges against the defendants, I am concurring in the majority opinion. I would have preferred, however, to join in an opinion which did not take away from the courts the power to punish a person guilty of encouraging a very young child to get married, even to get married in another State.