Janice EDWARDS, As Guardian of Joe Edwards *v.*
David STILLS and Tanya Stills

97-1168 984 S.W.2d 366

Supreme Court of Arkansas
Opinion delivered December 21, 1998

476

*Perroni & James Law Firm*, by: *Samuel A. Perroni, Patrick R. James*, and *Carla Rogers Nadzam*, for appellant.

*Matthews, Campbell, Rhoads, McClure & Thompson, P.A.*, by: *David R. Matthews*, for appellees.

DONALD L. CORBIN, Justice. This is a tort case. Appellant Janice Edwards, as Guardian of Joe Edwards, appeals the judgment of the Washington County Circuit Court in favor of Appellees David and Tanya Stills. The jury found that Appellant's husband, Joe Edwards, committed the torts of assault, battery, false imprisonment, and outrage against David Stills on March 17, 1995, and that his actions proximately caused Tanya Stills's loss of consortium with her husband. The Stillses were awarded $243,600 in compensatory damages and $1,500,000 in punitive damages. Appellant raises ten points on appeal. This case was certified to us from the Arkansas Court of Appeals on the basis that it is of substantial public interest and requires further development or clarification of the law; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(d). We affirm.

The pertinent events of March 17, 1995, are not disputed. Joe Edwards requested that David Stills meet him at a warehouse to discuss legal disputes that Edwards and his two corporations were having with the City of Springdale. At approximately 9:00 a.m., Edwards and Stills drove in Edwards's truck to the city administration building and met with the city inspector and the fire chief to discuss various code compliance issues for Edwards's businesses. After the meeting, Edwards and Stills got into Edwards's truck. Edwards began to discuss other legal concerns of his businesses, as he drove the parties away from the city adminis-

tration building to an open field located next to Edwards's warehouse. Edwards stopped the truck in the open field, pulled out a gun, pointed it at Stills, and stated, "We have some unfinished business." Edwards ordered Stills to put his hands on the dash of the truck and not to try anything because he would kill him. Edwards pointed the gun at Stills, cocked it, and held it cocked with his thumb while his finger was on the trigger. Edwards began to drive the truck again and said, "You need to tell me what's going on." Edwards continued to threaten to kill Stills while he drove to Edwards's house.

Once Edwards had driven to his home, he ordered Stills out of the truck, keeping the gun pointed at him, and into the house where Edwards disabled the home security system. Edwards then ordered Stills into the basement area, still pointing the gun at him. Once in the basement, Edwards took duct tape and bound Stills's hands and feet and tied him in a crouched position to a table leg. Edwards also used neck ties, belts, and ski rope to tie Stills to the table leg such that he could not move his hands, arms, or legs; Stills's hands soon became discolored from lack of circulation. Edwards then proceeded to tell Stills why he had abducted him. Edwards accused Stills of having an affair with his wife and supplying her with drugs and drug paraphernalia. Edwards also accused Stills of having stolen money ($20,000,000) from him. Despite Stills's constant assertion that he was innocent of the accusations and that Edwards ·was mistaken, Edwards repeatedly threatened Stills that he was going to kill him and that he would suffer an excruciatingly painful death. Edwards brandished two butcher knives before Stills and brought out of hiding a bottle of muriatic acid and threatened to put the acid on Stills's face and in his eyes. Edwards demonstrated the caustic effect of the muriatic acid on the stonework and carpet in front of Stills. Stills could see the muriatic acid smoke and sizzle as it ran down the stonework, onto the carpet. Throughout this time, Stills begged and pleaded for his life. Edwards told Stills of his intentions to bring Edwards's wife down to the basement where he would kill them both. Edwards even told Stills that he would abduct Stills's wife and make her watch him die. Edwards said that he had planned his actions and had talked to a friend about his plans. Edwards also

said that he had another gun waiting for him (Edwards), and that he was not going to spend the rest of his life in a 6 x 6 cell.

At one point, Edwards went upstairs where he telephoned his wife, speaking in a calm, normal tone of voice, about having some lunch. Edwards then left the house. After hearing Edwards leave and waiting until he thought that Edwards was not immediately coming back, Stills tried to get loose from his bindings, but his arms would not budge. Eventually, Stills was able to loosen the binding securing his torso to the table and free himself from the table leg, but he still could not use his arms or legs. Stills was able to crawl up the stairs where he raised himself up and hopped to the front door. Using his tongue and nose, Stills pressed the security key pad hoping to set off the security system and alert police. Stills then opened the front door, using his mouth and teeth, and went out on the porch, fell down, and rolled down the street. Eventually a passerby stopped his car and assisted Stills in contacting the police. Shortly thereafter, the Springdale Police Department arrested Edwards.

## I. Punitive Damages

For her first point for reversal, Appellant argues that the trial court erred in allowing an award of punitive damages for acts committed by Edwards while he was psychotic and delusional. Appellant asserts that Edwards was insane at the time of the incident, and thus that the award of punitive damages amounted to a deprivation of due process and constituted cruel and unusual punishment. She argues further that because the award of punitive damages was improper, it was error to allow Appellees to present evidence of the Edwardses' net worth, which was in excess of $14,000,000.

When we review an award of punitive damages, we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *United Ins. Co. of America v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998). Punitive damages are to be a penalty for conduct that is malicious or done with the deliberate intent to injure another. *Id.*

An instruction for punitive damages may be given when there is evidence that a party likely "'knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in reckless disregard of the consequences from which malice could be inferred.'" *McLaughlin v. Cox*, 324 Ark. 361, 371, 922 S.W.2d 327, 333 (1996) (quoting *Allred v. Demuth*, 319 Ark. 62, 890 S.W.2d 578 (1994) (quoting *Dongary Holstein Leasing, Inc. v. Covington*, 293 Ark. 112, 732 S.W.2d 465 (1987))). Punitive damages are justified only when the defendant acts wantonly or with such conscious indifference to the consequences of his acts that malice may be inferred. *J.B. Hunt Transp., Inc. v. Doss*, 320 Ark. 660, 899 S.W.2d 464 (1995). Negligence, however gross, will not support such an award. *Id.*

### A. Persons Suffering from Mental Disease or Defect

Appellant argues that punitive damages were not recoverable in this case because Edwards was suffering from psychosis and delusions at the time, and that his delusions and psychosis drove him to commit the actions against Stills. She contends that punitive damages are designed to punish tortfeasors and deter intentional, malicious conduct, and that such damages should never be awarded against persons suffering from a mental disease, because it would be unfair to punish a sick person who was not acting of his own free will. Appellant asserts that the criminal standard for the affirmative defense of insanity, whether the person lacked the capacity to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct, is not appropriate in civil cases. *See* Ark. Code Ann. § 5-2-312(a) (Repl. 1997). Rather, she advocates a lesser standard, based upon a case-by-case analysis of the defendant's mental state, where the evidence shows that the Appellant suffered from a mental disease or defect.

We are not persuaded by Appellant's argument for two reasons. First, Appellant offers no authority or convincing argument that the civil standard for insanity should be any different than the criminal standard. The cases that have addressed this issue, including those relied upon by Appellant, discuss the defendant's mental state in terms of his being legally insane or his being able to form

or possess the requisite intent for punitive damages. *See Preferred Risk Mut. Ins. Co. v. Saboda*, 489 So. 2d 768 (Fla. Dist. Ct. App. 1986) (holding that a deranged person, *one who cannot form a rational intent*, cannot be guilty of a wanton tort requiring actual or constructive malice and cannot be held liable for punitive damages); *Goff v. Taylor*, 708 S.W.2d 113 (Ky. Ct. App. 1986) (holding that mentally deficient persons are insulated from punitive damages, recognizing the duty to balance the protection of society at large with compassion for *those unable to conform their conduct to the expected standard*); *Jewell v. Colby*, 24 A. 902 (N.H. 1891) (holding that insanity is a defense to damages sought on account of the defendant's intent or motive because *an insane person has no will or motive*); *Lee v. Thomas*, 534 S.W.2d 422 (Tex. Civ. App. 1976) (holding that the defendant was not liable for exemplary or punitive damages because he was insane at the time, such that *he did not know right from wrong, did not know the nature and consequence of his actions*, and was not able to properly conduct his business affairs).

In *Bryant v. Carrier*, 198 S.E. 619 (N.C. 1938), the Supreme Court of North Carolina recognized that while an insane person is civilly liable for his torts and for compensatory damages, he is not necessarily liable for punitive damages. In order to justify punitive damages, the plaintiff must show that the defendant "was not insane at the time of the wrongs complained of, but was mentally competent, and that *he had legal capacity to commit the acts alleged with such elements of aggravation* as would justify the award of punitive damages." *Id.* at 620 (emphasis added). Similarly, in *Shumann v. Crofoot*, 602 P.2d 298 (Or. Ct. App. 1979), the Oregon Court of Appeals recognized that insanity is not an absolute defense to a claim for punitive damages; rather, it is a defense only if, at the time of the wrongful act, the defendant was "*incapable of exercising sufficient judgment* to render his conduct deserving of punishment[.]" *Id.* at 303 (emphasis added). The Oregon court held further that the issue of whether the defendant's mental state was such that punitive damages were appropriate was a question of fact to be resolved by the jury. *See also Delahanty v. Hinckley*, 799 F. Supp. 184 (D.D.C. 1992).

■ The foregoing cases demonstrate that the pertinent inquiry for determining whether punitive damages may be

assessed is whether the defendant was insane such that he was unable to form a rational intent or motive or was otherwise unable to conform his conduct to the standards of society and the law. None of those cases provide an absolute defense to a person who claims to have suffered from some form of mental disease or defect, unless the defect is such that it renders the person incapable of forming the requisite intent for punitive damages or incapable of conforming his behavior to the requirements of the law.

■ Second, Appellant has not provided us with any reason to apply a different standard for punitive damages merely because the person's defense is one of insanity. We believe that no matter what the defense, the focus remains on the defendant's intent in committing the acts. Our current standard for punitive damages, outlined above, encompasses the defendant's ability to act intentionally by requiring the plaintiff to prove that the defendant knew or should have known that his conduct would naturally or probably result in injury and that he continued such conduct wantonly or with conscious indifference to the consequences of his actions, such that malice may be inferred. Where the evidence shows that the defendant suffers from a mental disease or defect that renders him unable to appreciate the wrongfulness of his conduct, it naturally follows that he cannot be said to have acted wantonly, maliciously, or with *conscious* indifference to the consequences of his actions; hence, he would not be liable for punitive damages. We are thus not persuaded by Appellant's argument that a defendant should be insulated from punitive damages if he suffers from *any* mental disease or defect, regardless of how severe or how it affects his ability to conform his behavior to the requirements of the law.

Furthermore, Appellant's argument that it was error to award punitive damages in this case ignores the evidence presented at trial pertaining to Edwards's state of mind at the time of the incident. Dr. Gene Reid, a psychiatrist testifying for the defense, testified that he concluded that Edwards was suffering from an episode of what was apparently a recurring psychotic disorder. He stated that Edwards believed that his wife was having an affair in order to get drugs, and that his main concern was that people were going to enslave her to cocaine and eventually kill her and him. He diagnosed Edwards as having bipolar disorder, mixed typed,

because he had some depressive symptoms present at the same time with psychotic features. He indicated that delusions are psychotic symptoms. He stated that at the time Edwards kidnapped Stills, he was no longer able to conform his behavior to the law. Nevertheless, he stated that Edwards knew that what he was doing was illegal and wrong and could get him in a lot of trouble. Moreover, on cross-examination, Dr. Reid stated that had a police officer been present in the basement where Edwards had kidnapped Stills, Edwards would have been able to conform his behavior to the requirements of the law. He also stated that Edwards was capable of forming the intent to wrongfully threaten Stills; to touch, strike, or beat Stills; to restrain Stills's freedom; and to tie up Stills, pour acid on him, and threaten to kill him.

Dr. Michael G. Holloman, a staff psychiatrist at the Ozark Guidance Center in Springdale, testified that based on his interview of Edwards in March 1995, he believed that on the date in question, Edwards knew that he had done something that could be perceived as wrong, but he felt that what he was doing was right.

Dr. Philip Barling, a clinical psychologist from Fort Smith, testified in rebuttal for Appellees. Dr. Barling stated that he reviewed copies of Edwards's medical records, including the reports from Dr. Reid and Dr. Holloman. He stated that it was his opinion that on the date in question Edwards did appreciate that what he was doing was illegal and had the capacity to conform his behavior to the requirements of the law. He found significant the fact that on the morning of the incident, Edwards met with Stills in one location, drove with him alone to the fire station, and went through a business meeting without harming Stills. He stated that such behavior shows that Edwards exercised some self-control during the time that he was with Stills. He stated that such self-control historically is a principal part of determining whether someone has the capacity to conform their behavior to the requirements of the law. He stated that if a person were truly unable to conform his behavior to the requirements of the law, that person would not be able to stop at any time.

Dr. Barling also found significant Dr. Reid's records reflecting an incident in which Edwards told Dr. Reid that he had begun telling a psychologist (presumably Dr. Karen Courchaine) about his plan to kidnap Stills, a week prior to the incident. The records reflect that when the psychologist told Edwards that she could not guarantee confidentiality of such a plan, Edwards chose not to reveal the plan further. Dr. Barling stated that this was evidence of Edwards's ability to exercise self-restraint. He stated that his opinion that Edwards had the ability to conform his actions to the requirements of the law was strengthened by Dr. Reid's testimony that Edwards could have stopped at any time, and that he could have conformed his behavior had a police officer been present that day in the basement.

After hearing the evidence pertaining to Edwards's mental state, the jury specifically found that he committed the tort of outrage by forming the intent to willfully and wantonly engage in extreme and outrageous conduct against Stills. The jury found further that Edwards did not lack the capacity, as a result of mental disease or defect, to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct. We conclude that the evidence supports the jury's findings and the award of punitive damages on the basis that Edwards acted wantonly or with such conscious indifference to the consequences of his acts, such that malice may be inferred.

### B. Amount of Punitive Damages

Appellant next argues that the amount of the award was grossly excessive and thus violates notions of due process. She relies on the Supreme Court's holding in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). There, the Court held that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574 (footnote omitted). The Court established the following three guideposts for determining the reasonableness of an award of punitive damages: (1) The degree of reprehensibility of the defendant's conduct; (2) the disparity between the award and the actual harm

inflicted or potential harm; and (3) a comparison of the award to the civil or criminal penalties that could be imposed for the misconduct.

■ Applying those guideposts to this case, it becomes apparent that the amount of punitive damages awarded here is not grossly excessive. First, Appellant does not contest the gravity of Edwards's conduct toward Stills, but she argues that it should be considered less reprehensible because he was suffering from psychosis and delusions. We reject this argument for the reasons stated above.

■ Second, the disparity between the punitive damages and the actual or potential harm inflicted is not excessive. The jury awarded punitive damages of $1,500,000, a little over six times the amount awarded for compensatory damages, which was $243,600. By contrast, in *BMW*, 517 U.S. 559, the punitive damages were 500 times the amount of the actual damages. The Court concluded that the amount was excessive. The Court refused, however, to assign a specific mathematical formula for arriving at an acceptable amount of damages. This court has also refused to set a particular formula for measuring punitive damages; rather, the calculation of those damages lies within the discretion of the jury after due consideration of all the attendant circumstances. *Smith v. Hansen*, 323 Ark. 188, 914 S.W.2d 285 (1996). The penalty must be sufficient to deter similar conduct on the part of the same tortfeasor, and it should be sufficient to deter others who engage in similar conduct. *Id.* The jury is free to consider the extent and the enormity of the wrong, the intent of the parties, as well as the financial and social standing of the parties. *Id.* All of these elements were presented for the jury's consideration here.

■ Third, a comparison of the award to the civil or criminal penalties authorized by law also leads us to the conclusion that the award was not excessive. The permissible criminal penalty for the crime of kidnapping, a Class Y felony, is ten to forty years' or life imprisonment. *See* Ark. Code Ann. §§ 5-4-401 and 5-11-102 (Repl. 1997). Accordingly, we conclude that the amount of punitive damages awarded here was not excessive.

### C. Cruel and Unusual Punishment

 Lastly, Appellant argues that the award in this case constituted cruel and unusual punishment and thus violated the Eighth Amendment to the United States Constitution. Again, Appellant bases this argument on the assertion that Edwards committed these actions as a result of a mental disease or defect. Appellant cites no authority or convincing argument on this issue, and it is not apparent without further research that this argument is well taken. Accordingly, we will not address it. *See Webber v. Arkansas Dep't of Human Servs.*, 334 Ark. 527, 975 S.W.2d 829 (1998); *Country Corner Food & Drug, Inc. v. First State Bank*, 332 Ark. 645, 966 S.W.2d 894 (1998).

### II. Proffered Instruction and Interrogatory on Liability of Insane Person

 For her second point for reversal, Appellant argues that the trial court erred in refusing to give the following proffered jury instruction:

> An insane person is liable for his torts, unless the specific act complained of involves an intent which the person from whom recovery is sought is incapable of entertaining.

Appellant asserts that the proffered instruction was required by this court's decision in *Ragan v. Cox*, 210 Ark. 152, 194 S.W.2d 681 (1946). In *Ragan*, this court held that generally an insane person is liable for his torts, unless the specific act complained of involves an intent that the person from whom recovery is sought is incapable of entertaining.

Appellees point out that, although the trial court did not give the proffered instruction separately, it did incorporate the information into Instruction No. 14, which provided in part:

> Janice Edwards, as guardian for Joe Edwards, claims that at the time of his actions on March 17, 1995, Joe Edwards, because of mental disease or defect lacked the mental capacity to intentionally commit the torts of assault or battery or false imprisonment or to form the intent to willfully and wantonly engage in extreme and outrageous conduct. *The general rule of law is that a*

*person suffering from a mental disease or defect is liable for his torts, unless the specific act complained of involves an intent which the person from whom recovery is sought is incapable of entertaining.*

▮▮ ▮▮ We will not reverse a trial court's refusal to give a proffered instruction unless there was an abuse of discretion. *Coca-Cola Bottling Co. v. Priddy*, 328 Ark. 666, 945 S.W.2d 355 (1997). Furthermore, it is not error for the trial court to refuse a proffered jury instruction when the stated matter is correctly covered by other instructions. *Ouachita Wilderness Inst. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997). Appellant has failed to demonstrate that she was prejudiced or that the trial court abused its discretion by rejecting the proffered instruction in favor of Instruction No. 14. In fact, the instruction given may have been beneficial to Appellant as it included the term "mental disease or defect" as opposed to "insane," as set out in *Ragan*, 210 Ark. 152, 194 S.W.2d 681.

Appellant also argues that the trial court erred in refusing to give her proffered interrogatory pertaining to Edwards's mental state, which provided:

> *INTERROGATORY NO. 6*: Do you find from a prepon-derance of the evidence that on March 17, 1995, when the inci-dent occurred, Joe Edwards was suffering from psychosis or delusions?

Appellant contends that this was a proper statement of the law under *Ragan*, 210 Ark. 152, 194 S.W.2d 681, and section 5-2-312. We disagree.

▮▮ *Ragan* addressed the issue of liability where the person was unable to entertain the requisite intent to commit the wrong-ful act. Similarly, section 5-2-312 provides a defense to criminal liability if the person lacked the capacity to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct. Neither one of these authorities supports Appellant's proffered interrogatory. As discussed in the previous point, a per-son suffering from psychosis or delusions is not necessarily insane such that he cannot form the intent to commit a wrongful act, or appreciate the wrongfulness of his conduct, or conform his behav-ior to the requirements of the law.

## III. Privilege Against Self-Incrimination

For her third point for reversal, Appellant argues that the trial court erred in refusing to grant a mistrial based on Appellees' reference to Edwards's exercise of his privilege against self-incrimination under A.R.E. Rule 512. She asserts that the trial court had earlier granted a motion in limine on the issue, and that Appellees violated that ruling by referring to Edwards's invocation of his *Miranda* rights in their opening statement and by eliciting testimony from police officers about Edwards's assertion of his *Miranda* rights.

Appellees concede that they had agreed not to mention Edwards's refusal to testify in the civil case pursuant to Rule 512. They argue, however, that the evidence of Edwards's request to speak to his lawyer, immediately after the incident, was a separate issue. They assert that such evidence was relevant to show his mental state immediately after the crimes, particularly that he could appreciate the criminality of his actions and had the ability to conform his conduct to the requirements of the law.

The following comments were made during opening statement by Appellees' counsel David Matthews:

> [Y]ou will hear Officer Harrison of the Springdale Police Department testify that when he got there and Joe finally came outside, Joe gave him two bullets that were in his front pocket, two 38 caliber revolver bullets. He says, "I took them out of the gun because I didn't want to accidentally shoot him on the way over here." And he tells him that the gun, the 38 revolver, is in the truck. And he says, "I made a mistake and didn't complete the job." Officer Harrison says, "What job?" "I was going to kill them all." They take him to the station, they begin to give him his Miranda warnings and he says, "I don't want to talk to you, I want my lawyer." And his lawyer came.

Appellant's counsel Sam Perroni moved for a mistrial, stating:

> Your Honor, I move for a mistrial on the basis of Mr. Matthews' statements to this jury that Mr. Edwards invoked his Fifth Amendment privilege. It's a violation of the Constitution and of the Arkansas Rules of Evidence; it's highly prejudicial. It's going to invite attention by this jury as to why Mr. Edwards didn't tes-

tify, which is also inadmissable [sic] and subject to a Motion in Limine, I believe.

Mr. Matthews responded by acknowledging that he had agreed not to refer to Edwards's decision not to testify. He contended nonetheless that because Appellant had made Edwards's mental state an issue, the testimony that he had the presence of mind to ask for an attorney soon after the incident was relevant to his ability to conform his behavior to the law. The trial court denied the motion for mistrial on the basis that the evidence was probative of Edwards's mental state. The trial court concluded that such evidence was not covered by its previous ruling regarding Edwards's privilege not to testify in court.

Later, Appellant's counsel Patrick James objected when Appellees asked Springdale Police Detective Lester Coger about Edwards's exercise of his *Miranda* rights. Mr. James contended that such testimony was prohibited by the trial court's previous ruling on Appellant's motion in limine. The colloquy is as follows:

> THE COURT: Well, I thought we'd take — I mean, to me there's two different issues. Number one, his exercise of his right not to testify at the trial because of his constitutional right not to incriminate himself. And we've covered that and you've read the ruling, and that's how I remember it. The other issue was, when he was being questioned by the law enforcement authorities, his exercise of his right to remain silent. And I don't — I thought — well, maybe we didn't have — didn't we have a motion on that particular issue?

> MR. JAMES: We had a bar conference.

> MR. MATTHEWS: Your Honor, that's when Mr. Perroni interrupted my opening statement to move for a mistrial. That's when we took that issue up.

> THE COURT: Well, that was my ruling at that time at the bar conference. I guess it was not the subject of a Motion in Limine, but in my opinion even though Rule 512 states that, the general rule, because his mental capacity is in issue, I think it's more probative than prejudicial on that issue and I'm going to allow him to ask the question, as I indicated in my previous rul-

ing to Mr. Perroni, apparently at the bench during Mr. Matthews' opening statement.

MR. JAMES: Then just so we're clear for the record, it won't be necessary for us to stand up at the time those questions are elicited to preserve our objections.

THE COURT: Well, that's right, on those issues. I'll note your objection in the record to allowing the police officers to testify if he exercised his Miranda Rights. In a criminal case it's, you know, a lot different situation. Here we're in a civil matter wherein lack of mental capacity is being raised as an affirmative defense. While it's not precluded, and it often is in criminal matters, but I think it is a lot less persuasive in the civil side. An[d] over your objection, I'm going to admit it.

Detective Coger then testified that after he had advised Edwards of his right to have an attorney present during questioning, Edwards stated that he wanted to speak to his attorney. No further inquiry was made by Coger at that time.

The question of the scope of one's constitutional right against self-incrimination, as provided in the Fifth Amendment to the United States Constitution and Article 2, § 8, of the Arkansas Constitution, in a civil proceeding is one of first impression in this state. Accordingly, we look elsewhere for guidance.

In *Allen v. Illinois*, 478 U.S. 364 (1986), the Supreme Court addressed the applicability of the Fifth Amendment right not to be compelled to be a witness against oneself in a civil proceeding under the Illinois Sexually Dangerous Persons Act. The Court stated:

> The Self-Incrimination Clause of the Fifth Amendment, which applies to the States through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." This Court has long held that the privilege against self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'"

*Id.* at 368 (citations omitted). The Court reasoned that "[t]his Court has never held that the Due Process Clause of its own force requires application of the privilege against self-incrimination in a noncriminal proceeding, *where the privilege claimant is protected against his compelled answers in any subsequent criminal case.*" *Id.* at 374 (emphasis added).

Prior to that decision, the New York Court of Appeals held that a voluntary confession of arson taken by police without prior warning of the defendant's rights under *Escobedo v. Illinois*, 378 U.S. 478 (1964), the predecessor to *Miranda v. Arizona*, 384 U.S. 436 (1966), was admissible in a civil action. *Terpstra v. Niagara Fire Ins. Co.*, 256 N.E.2d 536 (N.Y. 1970). The court held further that the confession was admissible despite the fact that the appellant's request to consult with counsel had been denied. The court rejected the appellant's analogy of the right against self-incrimination to the right to be free from unreasonable searches and seizures, reasoning:

> [A] breach of Fourth Amendment rights occurs at the time a person's belongings are illegally confiscated whereas *a person's Fifth Amendment rights are violated only when his statements, taken without the necessary observance of his protection, are used against him in a criminal case.*

Id. at 538 (emphasis added). This holding is consistent with the Court's decision in *Allen*, 478 U.S. 364.

Even prior to its decision in *Allen*, in *Baxter v. Palmigiano*, 425 U.S. 308 (1976) the Court discussed the scope of the privilege in the context of civil prison disciplinary hearings. There, the petitioner was advised that he was not required to testify, but that if he chose to remain silent, his silence could be used against him. The Court concluded that permitting an adverse inference to be drawn from an inmate's silence at such a hearing is not, on its face, an invalid practice. The Court explained:

> Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does

> not preclude the inference where the privilege is claimed by a *party to a civil cause.*"

Id. at 318 (quoting 8 John H. Wigmore, *Evidence in Trial at Common Law* § 2272, at 439 (McNaughton rev. 1961)).

Relying on the Court's holding in *Baxter*, 425 U.S. 308, the Pennsylvania Commonwealth Court concluded that it was permissible for the Transportation Secretary to consider the appellant's failure to respond to a question during a hearing to restore his driver's license. *Realmuto v. Dep't of Transp.*, 637 A.2d 769 (Pa. Cmmw. Ct. 1994). The court held:

> The constitutional right against self-incrimination may be invoked in both criminal and civil proceedings, but only if the answer to a question would incriminate the witness in a subsequent *criminal* proceeding. Here, Realmuto did have the right to assert his constitutional privilege. However, *because the hearing before the Hearing Examiner was a civil proceeding, the Secretary also had the right to consider the failure of Realmuto to answer the question* when making his determination as to Realmuto's credibility.

*Id.* at 772 (citation omitted) (emphasis added).

Based on the foregoing holdings, we conclude that the statements referring to Edwards's claim of his right to remain silent and his request for an attorney were admissible in the civil proceedings against him. His Fifth Amendment right not to be compelled to be a witness against himself was not violated here, as the proceedings against him were not criminal. That right may only be violated if and when such statements are used against him in a criminal trial. Likewise, any inference drawn from his post-arrest silence is not violative of the Fifth Amendment because the privilege was claimed in a civil proceeding. Accordingly, we affirm the trial court's decision to admit the evidence as probative of Edwards's mental capacity and state of mind immediately after he committed the acts against Stills.

Correspondingly, we find no merit to Appellant's argument that a mistrial was warranted under Rule 512, which provides in part:

(a) *Comment or Inference Not Permitted.* The claim of a privilege whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. *No inference may be drawn therefrom.*

. . . .

(c) *Jury Instruction.* Upon request, any party against whom the jury might draw an adverse inference from claim or privilege is entitled to an instruction that no inference may be drawn therefrom. [Emphasis added.]

Rule 512 applies to the Fifth Amendment privilege against self-incrimination. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 117 S. Ct. 1853 (1997). The rule does not, however, provide an absolute prohibition against mentioning a claim of privilege. *Johnson v. State*, 298 Ark. 617, 770 S.W.2d 128 (1989). Moreover, the rule itself provides the appropriate sanction, a cautionary instruction to the jury, and where no such instruction is requested, the trial court's denial of a mistrial is not an abuse of discretion. *Id.* Here, Appellant failed to request a cautionary instruction to the jury pursuant to Rule 512(c). As such, the trial court's denial of the motion for mistrial was not an abuse of discretion.

## *IV. Settlement Negotiations*

For her fourth point for reversal, Appellant argues that the trial court erred in refusing to allow cross-examination of David Stills concerning a prior settlement negotiation between the parties. Stills testified that he had an equal interest in the criminal and civil cases against Edwards. Appellant contends that she should have been allowed to impeach Stills with an alleged settlement offer that Stills would make the criminal case go away if Edwards paid him enough money. Appellees argue that such a settlement offer was never made. The trial court disallowed the evidence under A.R.E. Rule 408, and also concluded that the probative value of the evidence, if any, was outweighed by its prejudicial effect.

Appellant correctly notes that Rule 408 is not a blanket prohibition against the admission of all evidence concern-

ing offers to compromise. *Ozark Auto Transp., Inc. v. Starkey*, 327 Ark. 227, 937 S.W.2d 175 (1997) (citing *McKenzie v. Tom Gibson Ford, Inc.*, 295 Ark. 326, 749 S.W.2d 653 (1988)). The rule does, however, prohibit the introduction of such evidence when the evidence is offered to prove "liability for, invalidity of, or amount of the claim or any other claim." *McKenzie*, 295 Ark. at 332-33, 749 S.W.2d at 657 (quoting A.R.E. Rule 408). Because Appellant offered this evidence to impeach Stills's credibility, Rule 408 does not bar its introduction; however, that does not mean that such evidence is automatically admissible. *Id.* Relevance of the evidence must still be determined under A.R.E. Rule 401, as well as admissibility under A.R.E. Rules 402 and 403. *Id.* The determination of whether the probative value of admitting the evidence is substantially outweighed by its prejudicial effect is left to the sound discretion of the trial court, and absent a manifest abuse of that discretion, we will not disturb the trial court's decision. *Sexton Law Firm, P.A. v. Milligan*, 329 Ark. 285, 948 S.W.2d 388 (1997).

 Appellant asserts that the evidence was proper to impeach Stills's credibility. In a motion to reconsider the trial court's ruling, Appellant's counsel recalled the events that had transpired:

> On Monday, February 17, 1997, counsel for David Stills informed counsel for the Defendant that if Joe Edward [sic] would pay $800,000.00, both this case and the criminal case would go away; specifically, a recommendation of a reduced felony charge; and probation with certain conditions regarding continued medical care.

Notably missing from the motion is what, if anything, David Stills said regarding his interest in the outcome of the criminal case. Indeed, Appellant made no proffer of what Stills's testimony would be, nor did she offer any evidence that Stills personally made the offer. As such, we do not see how the evidence would be relevant to show Stills's lack of veracity. Appellant's reliance on the holding in *Ozark Auto Transp., Inc.*, 327 Ark. 227, 937 S.W.2d 175, is thus misplaced, because the evidence admitted in that case was a letter written by the witness whose testimony the opposing side wished to impeach. Moreover, Appellees' counsel contested

Appellant's counsel's version of the settlement offer, and Appellant offered no proof of the terms of the offer, such as a confirmation letter. Accordingly, we cannot say that the trial court abused its discretion in refusing to permit the introduction of the proffered evidence.

## V. Ken Edwards's Testimony

For her fifth point for reversal, Appellant argues that it was error for the trial court to allow Appellees to present testimony from Edwards's cousin, Ken Edwards, concerning a prior violent incident involving Edwards. Appellee argues that Ken's testimony was independently relevant under A.R.E. Rule 404(b) to show Edwards's motive and intent in his actions against David Stills, and to show that Edwards had the mental capacity to commit the acts against Stills. The trial court found that the probative value of the evidence outweighed any prejudicial effect, in light of Appellant's defense that Edwards was suffering from a mental disease or defect.

Ken testified that he had previously been partners with Edwards in a bonded and public warehouse venture. In mid-August 1994, Edwards called Ken's home and asked Ken to meet him for coffee at Edwards's new warehouse. Ken agreed to meet Edwards at the warehouse, and when he arrived, Edwards acted normal and was friendly to Ken. Within ten or fifteen minutes of their being inside the warehouse, Edwards's demeanor changed. They walked around the warehouse for a little while discussing business. When they went back in the inner recesses of the building, Edwards became angry and began to curse and said, "someone's been in here messing with my paperwork and it would have to be a lawyer, and I think it's you." Edwards also accused Ken of messing around with his wife. Ken denied the accusations and started to leave when Edwards stated, "No, stay right where you are." Edwards then went some distance away and came back with gloves on and a knife in his hand. A fight ensued and Edwards began swinging rather wildly, grazing Ken on the ear and cutting it a little bit. After some mutual shoving, Ken ran away from Edwards, but he could not get out of the building because Edwards had previously locked the door. They chased one another around the building for about three hours, until Edwards

began to get exhausted and more upset. Afterwards, Edwards told Ken that he was convinced Ken was lying to him, and that Ken or some lawyer or some of Ken's partners were trying to ruin him. Edwards told Ken that he was going to let him go, but that if Ken's partner did not show up, as he had been invited to do, Edwards would know that Ken had intervened and he would have to kill him. Despite the threat, Edwards never pursued Ken again.

██ ██ Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith, but such evidence is admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Johnson v. State*, 333 Ark. 673, 972 S.W.2d 935 (1998). Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *Id.* We have stressed the requirement that there be a very high degree of similarity between the charged crime and the prior uncharged act. *Id.* The admission or rejection of evidence under Rule 404(b) is left to the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391 (1998). Before testimony of another crime is admitted under Rule 404(b), the probative value of the evidence must be weighed against the danger of unfair prejudice. *Id.* The standard of review of a trial court's weighing of probative value against unfair prejudice is whether the trial court abused its discretion. *Id.*

Appellant relies heavily on this court's decision in *Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995), for her assertion that the evidence was improper because there was not a high degree of similarity between the acts against Ken Edwards and those against Stills. She relies on the following specific holding of *Diffee*:

> There are two requirements for introducing evidence of an unrelated prior act to show a method of operation: "(1) both acts must be committed with the same or strikingly similar methodology; and (2) the methodology must be so unique that both acts can be attributed to one individual."

*Id.* at 675, 894 S.W.2d at 567 (quoting *Frensley v. State*, 291 Ark. 268, 724 S.W.2d 165 (1987) (citing Edward J. Imwinkelried, *Uncharged Misconduct Evidence* §§ 3.10 to 3.12 (1984))). Appellant's reliance on this holding is misplaced. It is obvious from the language that the expressed requirements pertain only to evidence intended to show method of operation. Here, the evidence was admitted to show Edwards's intent and motive, as well as his mental capacity to form such intent or motive.

Moreover, in *Diffee*, 319 Ark. 669, 894 S.W.2d 564, this court rejected the State's theory that the evidence was admissible to show Diffee's intent, plan, and identity, because there was little similarity between the charged act and the prior uncharged act. There, Diffee was charged with murdering her mother by stabbing her twenty-two times with an ice pick. The State presented testimony of Diffee's former husband, Eddie Diffee, that approximately three years earlier, Eddie had been sleeping in their home when he swiped and hit something that fell out of Diffee's hand, onto the floor. The object cut three of his fingers and struck him between his sideburn and eye. Diffee screamed and ran through the house to the kitchen, where she stated that a man had just run through their house. The next day, Eddie found an ice pick laying on the floor on the same side of the bed where he had been sleeping when he was injured. This court concluded that the trial court erred in allowing Eddie's testimony on the ground that "such use of an ice pick to assault her ex-husband, *absent specific threats to him or other evidence of an intent or plan to inflict harm or take his life,* simply does not pass muster as permitted evidence under A.R.E. 404(b)." *Id.* at 679, 894 S.W.2d at 570 (emphasis added).

■ In contrast, here, Edwards's actions against both Ken Edwards and David Stills involved not only very similar methods, but also specific threats to inflict physical harm upon both victims and, ultimately, to kill them. Both incidents involved (1) Edwards's delusions that the victims were somehow out to ruin him or his family and were also involved with his wife; (2) a plan to get the victim alone on Edwards's turf by evidencing a desire to talk about business; and (3) terrorizing the victim with the threat of death and the use of physical violence. Considering Appellant's defense that Edwards suffered from a mental disease or defect at

the time the acts were committed against Stills, evidence that Edwards had planned and committed a similar act a mere seven months earlier was relevant to show that he had the intent and capability to plan his actions against Stills and to carry out those plans. The trial court properly weighed the probative value of the evidence against the danger of unfair prejudice to Appellant's case and concluded that the evidence was probative of Edwards's intent and was particularly relevant to counter Appellant's defense of mental disease or defect. As such, we conclude that the trial court did not abuse its discretion in permitting the testimony.

## VI. Evidence of Prior Domestic Abuse

For her sixth point for reversal, Appellant argues that the trial court erred in admitting testimony of a prior episode of domestic violence between the Edwardses that occurred in October 1994. She also argues that it was error to admit evidence that both she and Edwards pleaded guilty to misdemeanor charges of battery as a result of that domestic disturbance. The trial court initially entered an order that Appellees would not be permitted to introduce evidence surrounding the disturbance. Appellant argues that the trial court thus erred in refusing to honor its previous ruling.

Appellant called three Springdale Police officers to testify about the disturbance. Officer David Clark testified that he had been dispatched to the Edwardses' residence on October 18, 1994, and that when he arrived, Joe Edwards stated that Appellant was using drugs and threatening to kill herself. Clark said that Edwards also stated that Appellant was having an affair with a man in Dallas. Clark stated that he ended up placing both Appellant and Edwards into his squad car and taking them down to the police station. On the way to the station, Edwards stated that both he and Appellant had been using methamphetamine earlier that day. Once they arrived at the station, Edwards stated that they had both used crack cocaine. Edwards later told Clark that those statements were not true, but that he had made them because he was concerned for his wife's safety because she was using drugs.

Prior to cross-examining Clark, Appellees' counsel asked the trial court to change its previous ruling on the ground that Appel-

lant had opened the door with the questions to Officer Clark. Appellees contended that it would be improper and unfair to allow Appellant to present only half of the story. Appellant asserted that the questions posed to Clark were limited to the allegations that Edwards made concerning Appellant's affairs and her use of drugs. The trial court agreed with Appellees that Appellant had opened the door to the subject. Appellees then asked Clark about the circumstances of the incident, including the fact that both Appellant and Edwards were arrested for domestic abuse and that both pleaded guilty to misdemeanor battery charges the following morning.

Appellant then called two other Springdale officers, Michael Haney and Brian Bersi, who testified that Edwards made an application to involuntarily commit Appellant the day after they were arrested for the domestic disturbance. It was not until both Haney and Bersi had been questioned on direct and cross-examination that Appellant made a motion for mistrial pertaining to the admission of the guilty pleas. The trial court ruled that the mistrial motion was untimely, that the previous motion at the bench did not address the subject of the guilty pleas, and that the testimony came in without objection by Appellant.

■■ We will not reverse the trial court's ruling on the admission of evidence absent an abuse of discretion. *Smith v. Galaz*, 330 Ark. 222, 953 S.W.2d 576 (1997); *Warhurst v. White*, 310 Ark. 546, 838 S.W.2d 350 (1992). Nor will we reverse absent a showing of prejudice. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702, *cert. denied*, 117 S. Ct. 246 (1996). Appellant has suffered no prejudice from the admission of the testimony because she opened the door to this line of questioning. *See Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998). She raised the subject on direct examination of a defense witness despite the fact that the trial court had previously entered an order prohibiting Appellees from broaching the subject.

■■ Furthermore, the separate point regarding the evidence of the Edwardses' guilty pleas is not preserved for our review because the evidence was not objected to in a timely manner. To preserve a point for appeal, a proper objection must be

asserted at the first opportunity after the matter to which objection has been made occurs. *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997). Likewise, motions for mistrial must be made at the first opportunity. *Id.* Despite the procedural bar, however, we would be inclined to affirm the trial court's ruling on this point since Appellant opened the door to this entire line of questioning.

### VII. Comments by the Trial Court

For her seventh point for reversal, Appellant argues that the trial court improperly commented on the evidence while Appellant's counsel, Mr. Perroni, was cross-examining Tanya Stills regarding entries she had made in a diary that she kept since the incident occurred. Appellant asserts that the trial court should have granted her motion for mistrial.

During Mrs. Stills's cross-examination, the following colloquy occurred between Mr. Perroni and the court:

> THE COURT: Mr. Perroni, I don't think we're getting anything accomplished about this trial. Let's move on to entries. I mean maybe there's something else down there, but we — we're not going to have all the time to go through this whole diary word for word.
>
> MR. PERRONI: All right, sir. I know, and I'm not planning on going all through it.
>
> THE COURT: Well, we're going to have to move on to something that's got some relevance and I haven't heard anything on this last go around with it.
>
> MR. PERRONI: Do you want me to move on then from this?
>
> THE COURT: Well, if you've got a question about the entry. I think we've got it on the screen and everybody can read it, but I didn't hear anything that she's read about that that's got any relevance to this lawsuit today.
>
> MR. PERRONI: Well, Your Honor, I was trying to get to a point where I could demonstrate when she was returning back to Fayetteville so I could find out how long she left Mr. Stills.

THE COURT: Well, why don't we ask her, instead of who she's in the hot tub with.

Mr. Perroni then asked Mrs. Stills two more questions, and she answered them. At that point, Mr. Perroni asked to approach the bench and objected to the court interrupting his cross-examination. The objection was based solely on the allegation that the trial court was interfering with and limiting defense counsel's cross-examination. Later, after Appellees had rested their case, Mr. Perroni moved for a mistrial, this time arguing that the court's comments during his cross-examination amounted to an improper comment on the evidence, such that a cautionary instruction would not cure it.

A mistrial is a drastic remedy that should only be used when there has been an error so prejudicial that justice cannot be served by continuing the trial, or when fundamental fairness of the trial itself has been manifestly affected. *Stecker v. First Commercial Trust Co.*, 331 Ark. 452, 962 S.W.2d 792 (1998). The trial court has wide discretion in granting or denying a motion for mistrial, and absent an abuse of that discretion, the decision will not be disturbed on appeal. *Id.* A mistrial will only be granted where any possible prejudice could not have been removed by an admonition to the jury. *Balentine v. Sparkman*, 327 Ark. 180, 937 S.W.2d 647 (1997). When there is doubt as to whether the trial court abused its discretion in denying a mistrial, a failure to request a cautionary instruction or an admonition will negate a mistrial motion. *Nobles v. Casebier*, 327 Ark. 440, 938 S.W.2d 849 (1997). Additionally, objections and motions for mistrial must be made at the first opportunity. *Smith*, 330 Ark. 50, 953 S.W.2d 870. Likewise, to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *Id.*

Here, Appellant's counsel did not object at the first opportunity; instead, he waited until after he had continued questioning the witness. Additionally, counsel did not move for a mistrial until after Appellees had presented their case-in-chief, and, even then, he did not request a cautionary instruction or an admonition. Moreover, the grounds stated for the mistrial were different than those stated for the objection. Accordingly, this point is not preserved for our review on appeal.

 Notwithstanding the procedural bar, we conclude that the trial court's remarks questioning the relevance of Appellant's particular line of cross-examination did not amount to a comment on the evidence. *See Echols*, 326 Ark. 917, 936 S.W.2d 509; *Warren v. State*, 272 Ark. 231, 613 S.W.2d 97 (1981). The trial court has wide latitude to impose reasonable limits on cross-examination based upon concerns about confusion of issues or interrogation that is only marginally relevant. *Larimore v. State*, 317 Ark. 111, 877 S.W.2d 570 (1994) (citing *Bowden v. State*, 301 Ark. 303, 783 S.W.2d 842 (1990)). We will not disturb this discretion upon review absent a showing of an abuse of that discretion. *Id.*

 In *Warren*, 272 Ark. 231, 234, 613 S.W.2d 97, 99, the State objected to the defendant's questioning, and the trial court responded, "What's puzzling me is what difference does it make? I don't think it's relevant is what I'm saying." After an in-chambers conference, the trial court allowed defendant to continue with that line of questioning. This court affirmed the trial court, holding that the court's questioning into relevancy did not amount to a comment on the evidence. This court stated:

> Clearly, if this inquiry into relevance could influence the jury in any manner, the case must be reversed, but since the appellant was allowed to pursue the line of questioning after the inquiry, we can see no possible inference on credibility, weight to be given, or any other matter.

*Id.* at 234, 613 S.W.2d at 99. Here, the trial court permitted defense counsel wide latitude in cross-examining Mrs. Stills; at the point of the trial court's comments, cross-examination of the witness concerning her diary had been going on for one and one-half to two hours. Furthermore, defense counsel was allowed to continue with his line of questioning. Accordingly, there was no abuse of discretion.

### VIII. Instruction on Loss of David Stills's Earning Capacity

For her eighth point for reversal, Appellant argues that it was error for the trial court to instruct the jury concerning David Stills's claim of loss of earning capacity because there was no proof of such loss admitted during the trial. She asserts that any evi-

dence presented by Appellees on this issue was too speculative to be submitted to the jury for decision. She also argues that the trial court erred in allowing Thomas Mars to give testimony beyond the scope of his statements given in deposition. We disagree.

██ ██ Loss of earnings and loss of earning capacity are two separate elements of damage. *Cates v. Brown*, 278 Ark. 242, 645 S.W.2d 658 (1983). Damage resulting from loss of earning capacity is the loss of the ability to earn in the future. *Id.* The impairment of the capacity to earn is the gravamen of the element. *Id.* Proof of this element does not, however, require the same specificity or detail as does proof of loss of future wages. *Id.* The reason is that the jury can observe the appearance of the plaintiff, his age, and the nature of the injuries that will impair his capacity to earn. *Id.* A serious or permanent injury may sustain the submission of the issue of loss of earning capacity to the jury. *Gipson v. Garrison*, 308 Ark. 344, 824 S.W.2d 829 (1992). This court has consistently held that a party is entitled to a jury instruction when it is a correct statement of the law, and there is some basis in the evidence to support the giving of the instruction. *Coca-Cola Bottling Co.*, 328 Ark. 666, 945 S.W.2d 355; *Yocum v. State*, 325 Ark. 180, 925 S.W.2d 385 (1996); *Parker v. Holder*, 315 Ark. 307, 867 S.W.2d 436 (1993). Thus, the relevant inquiry is whether there was some evidence of Stills's loss of earning capacity. We conclude there was.

David Stills testified about his law practice at the Fayetteville law firm of Everett and Mars. He stated that before the incident, thirty to forty percent of his practice was domestic-relations work, and that ten to fifteen percent consisted of representing people in criminal cases. He stated that after the incident, he no longer takes criminal cases, because he feels that he could not be compassionate to his clients and that he is generally uncomfortable being around such persons. Likewise, he stated that he no longer does much domestic-relations work because such work requires a lot of client contact on a day-to-day basis, and that, after the incident with Edwards, he does not like being around clients.

John Everett testified that he hired Stills as a full-time attorney at his firm right after Stills passed the bar examination. He

stated that Stills was a good lawyer, had a grasp for the common problems of common people, and related well to people. He described his practice as mostly trial practice, stating that in such a practice, one has to take divorce and criminal cases. He stated that Stills has had a hard time recovering from the kidnapping, and that Stills is not the lawyer today that he was before March 17, 1995. Everett confirmed Stills's refusal to get involved in criminal and domestic-relations cases and stated that he did not think Stills would ever do that kind of work again.

Thomas Mars testified that when he joined Everett's firm in 1993, he was aware of Stills's legal ability. He stated that considering the level of experience he had, Stills was not only the best young lawyer that he had ever worked with, but the best young lawyer that he had known in the community. He stated that before the kidnapping, he had talked to Stills about how he could improve and build his practice by becoming more involved in the commercial cases that Mars typically handled. He stated that in 1995, the firm as a whole did well, due in part to fees resulting from some big cases on which the firm had worked. He added that if Stills had been able to show up and continue working, he would have been able to work on those cases, too. He stated that neither he nor Everett felt comfortable giving Stills cases in 1995, and that he currently does not feel comfortable giving Stills cases like he had in the past. He stated that he can give Stills work under close supervision, wherein he is able to monitor his performance. He stated that after the incident the partners agreed that Stills would receive seven percent of the law firm's fees, while the other three lawyers in the firm received thirty-one percent. He explained:

> And I would have never viewed David, prior to this incident, as having less than one-fourth of the value of any other partner in the law firm. And so I don't know what percentage I might have assigned to him if I had been voting on that, but for this incident, but I know it would have been — it would have been higher than seven percent. I don't suppose I could guess about what it would have been, but it would have been more than a couple of percentage points higher because I, you know, perceived him as, you know, as having something in the range of, you know, maybe half the value of the rest of the partners. Simply because he had

about half the years of experience and half the client base and, you know, half of everything else. But, you know, I thought that the decision to assign David seven percent should be a pretty clear indication to him of our concern about his future with our firm and his performance and I could not, under any stretch of the imagination, characterize it myself as a promotion or recognition of his value.

The foregoing testimony provides some evidence of Stills's loss of earning capacity as a result of being kidnapped by a client, Joe Edwards, in March 1995. There was sufficient evidence presented on this issue such that the jurors were not forced to speculate as to any future loss. As such, the trial court did not err in instructing the jury on the issue of loss of earning capacity. "Recovery in a claim for loss of earning capacity is to be determined by the application of the common knowledge and experience of the jurors to the facts and circumstances of the case." *Gipson*, 308 Ark. at 348, 824 S.W.2d at 832 (citing *Coleman v. Cathey*, 263 Ark. 450, 565 S.W.2d 426 (1978)). Accordingly, we reject Appellant's argument on this point.

We further reject Appellant's argument that the trial court erred in allowing Appellees to present Mars's opinion of Stills's damages. The testimony that she takes issue with concerned the amount of money the firm made in 1994 and 1995, particularly that 1995 had been a good year for the firm (making $1,650,000), but that Stills was not able to work on those cases. Appellant asserts that such testimony implies that had Stills worked on those cases, he would have made more money in 1995. Appellant objected to the testimony on the ground that it went beyond that previously testified by Mars in his deposition, and that the trial court had previously ruled that Mars would be limited to his deposition testimony regarding computation of damages. The trial court allowed it on the basis that Appellant had opened the door with her questions of other witnesses on that issue. Appellant did not contest the trial court's ruling that she had opened the door, nor does she on appeal.

The record reflects that Appellant cross-examined Stills regarding how much he earned in 1995 and whether he made a $30,000 contingency fee that year. Stills replied that he

had not made any fees at all in 1995. We thus cannot say that the trial court abused its discretion in allowing Mars's testimony about the income and fees the firm received in 1995. Appellant's cross-examination of Stills opened the door to that line of questioning. *See Willis*, 334 Ark. 412, 977 S.W.2d 890. Likewise, we reject Appellant's argument that she was denied timely discovery of Mars's testimony. We will not reverse the trial court's discovery ruling absent an abuse of discretion. *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992).

## IX. Psychologist's Notes

For her ninth point for reversal, Appellant argues that the trial court erred in admitting the notes of Dr. Karen Courchaine, a psychologist who counseled Edwards and other family members during February and March 1995. The notes contained one entry from February and three entries from March 1995, including one from March 16, the day before the kidnapping, and one from March 18, the day after the incident. Appellant claims that the notes were not admissible because they were hearsay, lacked an adequate foundation, were unfairly prejudicial, and denied her the opportunity to cross-examine the witness.

The trial court admitted the notes under both the business-records and medical-records exceptions to the hearsay rule, pursuant to this court's holding in *Benson v. Shuler Drilling Co.*, 316 Ark. 101, 871 S.W.2d 552 (1994). The trial court overruled Appellant's objection that the notes lacked the necessary indicia of trustworthiness and would mislead the jury. Additionally, the trial court overruled Appellant's motion to take Courchaine's deposition over the telephone on the ground that the period for discovery had long been closed, and that Appellees would be prejudiced by deposing her at such a late date. The trial court stated:

> [T]here's nothing in these records to indicate to me that these statements were made other than to get a truthful diagnosis and treatment of Mr. Edwards as well as the family counseling for Mrs. Edwards and the family. *Now, the argument that these records don't mean what they say, you can still make that to the jury when you say that's her conclusion and it doesn't show words. I mean, they're not in quotes and that argument can still be made.* Now, we had discov-

ery deadlines and cutoffs that both sides agreed to early on. . . .
Both sides needed an equal access to all the evidence and all the
records. And the evidence to me indicates that [Appellant's] side
knew about Dr. Courchaine, or what do you call her, a licensed
psychologist, or just a psychologist way back there. *That name
was known to you all and if you choose to depose her, that's fine, or if
you choose to roll the dice and say, "Surely the Judge isn't going to let
those records in," and you lose, why, you know, you've just got to live
with the ruling,* and I'm sorry that you feel that way. *Furthermore, I
note for the record that it's not an affidavit that you submitted to me in
your notes from Dr. Courchaine. I'm not saying that that's not what
she's told you, but just for the record that it wasn't sworn to, but state-
ments made by counsel,* and they're in the record with your Motion
in Limine. But for those reasons, I don't feel that your side is
being unduly limited to the evidence that was out there.
[Emphasis added.]

Appellant argues that Dr. Courchaine's notes were not
proper medical records because she was not, at the time she coun-
seled the Edwardses, a licensed psychologist. (Appellant does not
contest the fact that Courchaine had obtained her Ph.D.) She also
argues that the notes from March 18, 1995, when Courchaine vis-
ited Edwards in jail, were not medical records because the notes
reflect that Courchaine was there for support only. We need not
reach this argument, as we affirm the trial court's admission of the
notes as business records pursuant to A.R.E. Rule 803(6).

 Generally, one who offers evidence has the burden
of showing its admissibility. *Benson,* 316 Ark. 101, 871 S.W.2d
552. The introduction of evidence is a matter within the sound
discretion of the trial court, and we will not reverse absent an
abuse of that discretion. *Id.* Arkansas Rule of Evidence 803(6)
provides an exception to the hearsay rule for the admission of
business records. That exception has seven requirements: (1) a
record or other compilation, (2) of acts or events, (3) made at or
near the time the act or event occurred, (4) by a person with
knowledge, or from information transmitted by a person with
knowledge, (5) kept in the course of regularly conducted business,
(6) which has a regular practice of recording such information, (7)
all as known by the testimony of the custodian or other qualified
witness. *Benson,* 316 Ark. 101, 871 S.W.2d 552 (citing *Terry v.*

*State*, 309 Ark. 64, 826 S.W.2d 817 (1992)). Rule 803(6) further provides that business records will not be admitted if the source of information or the method of circumstances of preparation indicate lack of trustworthiness. *Id.* Medical records may be admissible under the business-records exception. *See Terry*, 309 Ark. 64, 826 S.W.2d 817.

 At trial, Appellees admitted the notes through the testimony of Janet Prichard Parks. She stated that she was the office manager of Fayetteville Clinical Community Psychology and Counseling, P.A., and that part of her duties included the maintenance of the psychologists' notes of their visits with clients. She stated that Plaintiff's Exhibit 30, Dr. Courchaine's notes, was a record of acts or events that had been made at or near the time that they occurred. She recognized Dr. Courchaine's initials and signature on the notes. She stated that it was Dr. Courchaine's practice to type her notes at home on her computer, initial her typewritten entries, and then bring them to Parks. She stated that she kept these records routinely, and that she has a regular practice of recording the information that comes from client interaction. Based on this testimony, we conclude that the trial court did not abuse its discretion in admitting the notes under the business-records exception in Rule 803(6).

Appellant additionally argues that the notes lack the necessary indicia of trustworthiness. Appellant particularly takes issue with one statement in the entry from March 18, which reflects:

> Joe stated that he was aware of the consequences of his actions and that he would most likely spend time in prison, at which point he stated that he was unsure whether or not he would become suicidal in the future.

Appellant contends that this statement did not come from Edwards; rather, she asserts that it was a conclusion reached by Dr. Courchaine. Appellant proffered evidence that Dr. Courchaine would testify that the foregoing language was hers, not Edwards's. The crux of this argument is Appellant's objection to the words that Edwards was "aware of the consequences of his actions." She contends that those words are terms of art and would not have been used by Edwards in describing his own situation. As such,

she asserts that the foregoing statement was a conclusion reached by Dr. Courchaine, not a verbatim statement from Edwards.

■ Appellees point out that the complete statement taken in context underscores the trustworthiness of the notes, regardless of whether those exact words were used by Edwards. We agree with Appellees' assessment of the statement. The statement indicates that Edwards was aware that he would spend some time in prison as a result of his actions. This evidence was highly probative of his mental state the day after the incident had occurred. Similarly, we reject Appellant's argument that the foregoing statement constituted Dr. Courchaine's expert opinion and thus required a proper foundation under A.R.E. Rules 702 to 705. The statement did not contain a diagnosis or any such expert testimony; rather, it was merely a reflection of Edwards's acknowledgment that he would likely go to prison for his actions against Stills. As such, we cannot say that the trial court abused its discretion in admitting the notes.

■ Lastly, Appellant argues that the notes should have been excluded under Rule 403 because they would only mislead or confuse the jury. Appellant cites no authority for this argument other than the unsworn proffered testimony from Dr. Courchaine that the words used were hers, not Edwards's. As such, we do not consider this argument. We will not consider assignments of error that are unsupported by convincing legal authority or argument. *Berry v. St. Paul Fire & Marine Ins. Co.*, 328 Ark. 553, 944 S.W.2d 838 (1997).

We note that the trial court did not admit the proffered testimony due to the fact that it was untimely offered, long after the discovery deadlines had passed. The trial court's ruling reflects that Appellant chose to "roll the dice" and bet that the trial court was not going to allow admission of the notes. We agree with the trial court that Appellant could have deposed Dr. Courchaine during the time that discovery was open, and that it is no one's fault but Appellant's that such action was not taken. The trial court has wide discretion in matters pertaining to discovery, and we will not reverse absent an abuse of that discretion. *Stein*, 308 Ark. 74, 823 S.W.2d 832.

### X. Cumulative Error

 For her final point for reversal, Appellant argues that the following rulings individually and cumulatively denied her and her husband a fair trial. We do not reach the merits of this cumulative-error argument, as Appellant failed to make a cumulative-error objection below. We have previously held that an appellant asserting a cumulative-error argument must show that there were individual objections to the alleged errors *and* that the cumulative-error objection was made to the trial court and a ruling was obtained. *Willis*, 334 Ark. 412, 977 S.W.2d 890; *Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998); *Munson*, 331 Ark. 41, 959 S.W.2d 391. We will, however, consider the merits of the individual assignments of error where objection was made below. *Britt*, 334 Ark. 142, 974 S.W.2d 436.

### A. Wedding Photograph

The first alleged error involves the trial court's admission of Appellees' wedding photograph during rebuttal. Appellant argues that the photograph was not properly disclosed as an exhibit, that it was improper rebuttal evidence, and that it was prejudicially used in closing rebuttal argument when Appellees' counsel tore the photograph in half, as an example of how Edwards's actions tore apart their marriage. At trial, however, Appellant's only objection to the photograph was that it was not proper rebuttal evidence. The trial court ruled that even though Appellees could have introduced the photograph during their case-in-chief, it was proper to rebut Appellant's evidence that David Stills could not commit to his marriage, that he was not able to be happily married, and that the marriage was doomed.

 Admissibility of rebuttal evidence lies within the discretion of the trial court, and we will not reverse absent a showing of abuse of that discretion. *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998). Genuine rebuttal is evidence that is offered in reply to new matters; however, the fact that the evidence could have been presented in the case-in-chief does not preclude its introduction on rebuttal if it serves to refute evidence raised by the defense. *Id.* Here, the photograph was admitted to

rebut the defense's contention that Appellees had an unhappy marriage. As such, Appellant has not shown that the trial court abused its discretion in permitting the evidence.

### B. Acid Demonstration

Appellant argues that the trial court erred in allowing Appellees to present a demonstration using muriatic acid on a rock on the basis that it was not an accurate re-enactment of the what had occurred in Edwards's basement and that it was thus prohibited by Rule 403. We disagree.

 The admissibility and use of demonstrative evidence is a matter falling within the wide discretion of the trial court. *Berry*, 328 Ark. 553, 944 S.W.2d 838. When a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the accident. *Carr v. Suzuki Motor Co.*, 280 Ark. 1, 655 S.W.2d 364 (1983). When, however, an experiment is designed to show the general traits and capacities of a material involved in the controversy, it is admissible even though it does not conform to the conditions surrounding the litigated situation. *Id.* Relying on the holding in *Carr*, the trial court ruled that the demonstration would be allowed to show the jury the chemical characteristics of the acid. The trial court did not abuse its discretion.

### C. Cross-Examination of Dr. Philip Barling

Appellant argues that the trial court erred in denying her the opportunity to *voir dire* Dr. Philip Barling concerning his expert qualifications and in denying her ample cross-examination of him. There is no merit to this argument.

 Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Smith*, 330 Ark. 50, 953 S.W.2d 870. If any reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Id.* The general test of admissibility of expert testi-

mony is whether it will assist the trier of fact in understanding the evidence presented or determining a fact in issue. *Id.*

■ Here, defense counsel objected to Dr. Barling's qualifications to give an opinion on whether Edwards had the ability to (1) comprehend that what he was doing was legally wrong and (2) conform his behavior to the requirements of the law. Counsel asked to *voir dire* the witness. The trial court found that a proper foundation had been laid, specifically that he had practiced psychology for almost twenty years, had some training in forensic psychology, and had testified as an expert witness on psychological matters in various courts of this state. The trial judge stated that, based on the qualifications he heard, he felt it was more appropriate to permit Appellant to go into the doctor's particular qualifications on cross-examination. This ruling was well within the trial court's discretion.

■ Similarly, we find no merit to the issue that the trial court denied Appellant a full opportunity to cross-examine Dr. Barling concerning the bases for his opinion. It appears from the record that although cross-examination was interrupted at one point, Appellant's cross-examination of the witness was otherwise unrestricted.

### D. Rebuttal Argument

■ Lastly, Appellant argues that the trial court erred in refusing to allow her an opportunity to rebut Appellees' closing argument regarding Edwards's mental state. In other words, Appellant wanted to be able to make a closing argument for the defense and then another argument following the plaintiffs' closing rebuttal argument. Because Appellant cites no authority nor convincing argument for this point, we will not address it.

Affirmed.

IMBER and THORNTON, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. I agree with the majority on all points of appeal except for its conclusion with regard to the admissibility of Ken Edwards's testimony. With regard to the latter, I must join the dissent's conclu-

sion that Mr. Edwards's testimony was inadmissible under Ark. R. Evid. 404(b).

R AY THORNTON, Justice, dissenting. In this case, we are asked to determine what degree of insanity must be proved by a defendant in order to avoid punitive damages for his outrageous acts against a victim. There is no question that a perpetrator is liable for the injury he inflicts and can be held accountable for both the actual and compensatory damages which result from his actions, regardless of his mental capacity. However, as pointed out by the majority, punitive damages are justified only when the acts are committed wantonly or with such conscious indifference to the consequences of the acts that malice may be inferred. *J. B. Hunt Transp., Inc. v. Doss*, 320 Ark. 660, 899 S.W.2d 464 (1995).

The majority also notes that in cases decided in other jurisdictions, a requirement has been established that, in order to justify punitive damages, the plaintiff must show that the defendant "was not insane at the time of the wrongs complained of, but was mentally competent and that he had legal capacity to commit the acts alleged with such elements of aggravation as would justify the award of punitive damages." *Bryant v. Carrier*, 198 S.E. 619 (N.C. 1938).

In my view, the plaintiff's burden of proof to show that the defendant had the capacity to form a rational intent, as required to justify the award of punitive damages in a civil case, should not be the same as that degree of proof required of a defendant in order to establish legal insanity as an affirmative defense in a criminal action. This question is one of first impression, and the majority opinion will resolve the issue.

However, I write to express my disagreement with the conclusion reached by the majority regarding the admissibility of Ken Edwards's testimony concerning a prior bad act committed by the defendant. The defendant presented substantial expert testimony and other evidence that he was suffering from psychosis and delusions that drove him to commit the acts against Stills. The defendant contends he was a delusional person who could not form a rational intent as required to support an award of punitive dam-

ages. *See Preferred Risk Mut. Ins. Co. v. Saboda*, 489 So. 2d 768 (Fla. Dist. Ct. App. 1986). To counter this evidence of mental incapacity, Stills introduced evidence, over defendant's objections, of a previous bad act committed by Edwards against his nephew, Ken Edwards.

The majority correctly points out that *Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995) establishes the correct standard for allowing evidence of a prior bad act to show method of operation. Here, we are not concerned with method of operation, but are concerned with intent or motive. However, as we stated in *Diffee*, the witness's testimony did not pass the requirements of Ark. R. Evid. 404(b) absent specific threats or other evidence of an *intent or plan* to inflict harm or take his life. *Diffee* at 679, 570 (emphasis added). We clearly pointed out in *Abernathy v. State*, 325 Ark. 61, 925 S.W.2d 380 (1996), that while the erroneously admitted evidence in *Diffee* was offered to show method of operation, the requirement of similarity in circumstances between the uncharged misconduct and the charged crime also applies when the State (or, parallel to this, the plaintiff) offers the evidence to prove *intent* or the absence of mistake. *Abernathy* at 64–65 (emphasis added). In the instant case, the majority claims that the incidents involving Ken Edwards and Stills are very similar. The differences in the two incidents include: location, choice of weapon, and method of restraint. Because of these and many other differences, I believe the evidence of this prior bad act fails to meet the first test as set out in *Diffee* which states that both acts must be committed with the same or strikingly similar methodology. *Diffee* at 675. Additionally, there was no evidence shown that Edwards made any type of specific threat against Stills during his assault on Ken. I do not read Ark. R. Evid. 404(b) to say that motive or intent is shown just because specific threats were made to each victim. If Edwards had made threats against Stills to Ken, then the prior bad act might go to show intent or motive to inflict harm upon Stills.

Arkansas Rules of Evidence Rule 404(b) provides:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts *is not admissible to prove the character of a person* in order to show that he acted in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. Rule. Evid. 404(b) (1998)(emphasis supplied).

In my view, the trial court committed reversible error in allowing the admission of evidence that, seven months before the outrageous assault upon Stills, Edwards had lured his nephew, Ken Edwards, to a warehouse where he assaulted him in a berserk manner, accusing him of having an affair with his wife, and of conspiring to kill him.

I fail to see how Edwards's actions against this third person go to show intent or motive to hurt Stills, or his mental capacity or lack of mental capacity to rationally conduct such outrageous behavior. Simply because Edwards assaulted Ken, does not show any intent to hurt Stills. Even if the testimony showed that seven months earlier Edwards had the necessary intent to assault Ken, it does not follow that Edwards had the intent, or could form the intent seven months later, to hurt Stills.

In *Rowdean v. State*, 280 Ark. 146, 655 S.W.2d 413 (1983) the appellant was convicted of first degree murder for shooting a man outside a nightclub. Evidence was admitted to show that earlier in the same night the appellant pulled a gun on a patron of a drive-in. We held that the testimony should not have been admitted into evidence because it was wholly unrelated to the second event. Likewise, the Court of Appeals held in *Lincoln v. State*, 12 Ark. App. 46, 670 S.W.2d 819 (1984), that evidence that the appellant had an argument with another man, and waved a pistol around during the argument earlier in the same evening that the shooting occurred should not have been admitted, since it was unrelated to the shooting and was, therefore, irrelevant.

We held in *Starling v. State*, 301 Ark. 603, 786 S.W.2d 114 (1990), that testimony that the defendant had used physical force against *his wife*, threatened to kill her with a gun, and abused his wife *was admissible to show motive, intent, or plan to kill his wife. Id.* at 605 (emphasis supplied).

The rule seems to be that when the prior bad act was directed toward the victim and not to a third party it could be admissible, but when the prior bad act is directed against a third party it is not admissible. I cannot agree with the majority's conclusion that Edwards's actions against his nephew show intent or motive to hurt Stills. The only effect this evidence had was to inflame the jury by showing that Edwards had committed a somewhat similar bad act several months prior. Any probative value of this evidence was substantially outweighed by the danger of unfair prejudice. Thus, the evidence was inadmissible under Ark. R. Evid. 403.

Because I believe that the admission of this evidence was in violation of Ark. R. Evid. 404(b) and 403, and was reversible error, and because of my misgivings about the standard of mental competency required to form the intent necessary to sustain an award of punitive damages in a civil action, I respectfully dissent.